# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

| | |
|---|---|
| Case No.: | 2018AP2240-CR |

Complete Title of Case:

**STATE OF WISCONSIN,**

**PLAINTIFF-APPELLANT,**

**V.**

**DAVID M. HAY,**

**DEFENDANT-RESPONDENT.**

| | |
|---|---|
| Opinion Filed: | May 27, 2020 |
| Submitted on Briefs: | November 26, 2019 |

| | |
|---|---|
| JUDGES: | Reilly, P.J., Gundrum and Davis, JJ. |
| Concurred: | |
| Dissented: | |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Michael C. Sanders*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |
| Respondent ATTORNEYS: | On behalf of the defendant-respondent, the cause was submitted on the brief of *Mark R. Thompson*, assistant state public defender of Madison. |

**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**May 27, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* **WIS. STAT. § 808.10 and RULE 809.62.**

**Appeal No.**     **2018AP2240-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2018CF337

**IN COURT OF APPEALS**

---

STATE OF WISCONSIN,

    PLAINTIFF-APPELLANT,

  V.

DAVID M. HAY,

    DEFENDANT-RESPONDENT.

---

APPEAL from orders of the circuit court for Waukesha County: MICHAEL J. APRAHAMIAN, Judge. *Affirmed.*

Before Reilly, P.J., Gundrum and Davis, JJ.

¶1 GUNDRUM, J. The State appeals from an order granting David Hay's motion to suppress the results of a warrantless blood draw performed after Hay was arrested for fifth offense operating a motor vehicle while intoxicated (OWI) and from an order denying the State's motion for reconsideration. The State asserts the court erred in granting Hay's suppression motion because exigent

circumstances justified drawing Hay's blood without a warrant. Because the State failed to meet its burden of demonstrating that the blood draw was lawfully conducted without a warrant, we conclude the court did not err.

### *Background*

¶2      City of Brookfield Police Officer Kyle Stommes arrested Hay for OWI and directed that a sample of his blood be drawn, without a warrant, and tested. The test results showed a .00 blood alcohol concentration (BAC) but indicated Hay had cocaine in his system. Hay was charged with OWI in violation of WIS. STAT. § 346.63(1)(am) (2017-18),[1] fifth offense, due to having "a detectable amount of a restricted controlled substance" in his blood while driving. Hay moved to suppress the test results on the basis that his Fourth Amendment rights were violated when his blood was drawn without a warrant. A hearing was held on Hay's motion, Stommes was the only witness to testify, and his relevant testimony is as follows.

¶3      At approximately 12:50 a.m. on July 6, 2017, Stommes conducted a traffic stop on Hay. Stommes learned Hay had been drinking, had four prior OWI-related convictions, and thus was subject to a .02 BAC limit, rather than the normal .08 limit. A backup officer arrived, and a preliminary breath test (PBT) indicated Hay had a .032 BAC. Hay was arrested at 1:09 a.m. and was then handcuffed, searched, and secured in the back of Stommes' squad car. Stommes searched Hay's vehicle for OWI-related evidence while the backup officer "monitor[ed]" Hay.

¶4      Since Hay's vehicle was not on his own property, city policy required that it be towed. Related to that, the officers "wait[ed]" for a third officer to arrive

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

to "sit" with the vehicle until the tow truck arrived. After the third officer arrived, Stommes transported Hay "ten, 15 minutes" to Elmbrook Memorial Hospital for a blood draw while the backup officer followed in his police vehicle. Entering the hospital, Stommes notified hospital staff that they were near the emergency room and needed a phlebotomist to perform a blood draw. Stommes prepared and issued citations to Hay and, at approximately 1:45 a.m., read him the Informing the Accused form. Hay indicated he wanted to speak with an attorney, and Stommes informed him that would not be allowed at that time. Hay then refused to submit to a blood draw.

¶5     Following Hay's refusal, Stommes contacted the on-call assistant district attorney (ADA). At approximately 1:50 a.m., Stommes advised the ADA that he believed "it was [an] exigency in this matter due to the loss of evidence and the subject's blood at which point she agreed with me due to the .02 restriction and him blowing ... a .032 and the time that had already elapsed that we should go with a warrantless blood draw." The hospital staff informed the officer that a phlebotomist would be coming to draw the blood, but due to hospital delays, likely related to there being only "one phlebotomist at that time of night for the entire hospital," Hay's blood was not drawn until 2:25 a.m. At no point was any attempt made to secure a search warrant for the blood draw.

¶6     Stommes indicated that "[f]rom traffic stop to that phone call" to the ADA, he was "doing official police work" and was not "just waiting around to burn the clock." He testified that "normally" he would have prepared an affidavit for a warrant before contacting an on-call ADA, but he did not do so in this case because he believed exigent circumstances existed. He indicated he was aware, based upon his training, that once an individual stops consuming alcohol, the alcohol in his or her system can dissipate "anywhere from .015 to a .02 per hour."

3

¶7 In response to questions from the circuit court, Stommes testified that this was the first time he had ever done a warrantless blood draw. He had previously sought three or four blood-draw warrants and it had taken "[a]n hour, hour and a half" "from the time [he] filled out the affidavit and warrant to the time [he] received the signed warrant back from the judge." The court also asked Stommes why *he* searched Hay's vehicle instead of using that time to complete arrest-related paperwork and letting the backup officer search the vehicle. The court added: "You know you're in a rush." Stommes responded: "It's been our practice that … the individual that's arresting the subject ... do a quick search of the vehicle." He indicated he was "looking for alcohol related items ... and making sure there was nothing … Hay needed from his vehicle."

¶8 The circuit court granted Hay's suppression motion, concluding that exigent circumstances did not exist to justify the drawing of Hay's blood without a warrant. The court observed that "this case is marked by the lack of complication and absence of chaos" that underpin various Wisconsin cases finding exigent circumstances and was, "like *McNeely*,"[2] "a run-of-the-mill OWI investigation." The court added that here:

> There was no accident. There was no injury. There was no medical emergency. There was no crime scene investigation. There was no delay in the officer finding probable cause to arrest.… Unlike all of the other cases cited by the parties, aside from the dissipation of alcohol, there are no 'special facts' that support exigency here.

The State moved for reconsideration, which motion the circuit court denied. The State appeals.

---

[2] *Missouri v. McNeely*, 569 U.S. 141 (2013).

*Discussion*

¶9 The State argues that the circuit court erred in granting Hay's suppression motion because "[e]xigent circumstances justified drawing Hay's blood without a warrant." Where, as here, the facts are not in dispute, we independently apply the relevant constitutional principles to those facts. *State v. Delap*, 2018 WI 64, ¶28, 382 Wis. 2d 92, 913 N.W.2d 175.

¶10 "A blood draw is a search of the person," and performing such a search without a warrant is "presumptively unreasonable" under the Fourth Amendment. *State v. Brar*, 2017 WI 73, ¶16, 376 Wis. 2d 685, 898 N.W.2d 499 (citation omitted); *State v. Howes*, 2017 WI 18, ¶20, 373 Wis. 2d 468, 893 N.W.2d 812. There are, however, several recognized exceptions to the warrant requirement. *State v. Ziedonis*, 2005 WI App 249, ¶13, 287 Wis. 2d 831, 707 N.W.2d 565. The exception at issue in this case—exigent circumstances—applies when, based upon the totality of the circumstances, "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *See Missouri v. McNeely*, 569 U.S. 141, 148-49, 156 (2013) (citation omitted); *Howes*, 373 Wis. 2d 468, ¶¶23, 29. Exigent circumstances exist when "the need for a search is urgent and there is insufficient time to obtain a warrant." *State v. Dalton*, 2018 WI 85, ¶39, 383 Wis. 2d 147, 914 N.W.2d 120.

¶11 "In an OWI case, the natural dissipation of alcohol in the bloodstream may present a risk that evidence will be destroyed and may therefore support a finding of exigency in a specific case." *Dalton*, 383 Wis. 2d 147, ¶40. Exigent circumstances justifying a warrantless blood draw also "may arise in the regular course of law enforcement due to delays from the warrant application process." *Id.*

5

(citation omitted). The State, however, bears the "heavy burden" of proving by clear and convincing evidence that the exigent-circumstances exception applies. *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984) ("[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests."); *State v. Kennedy*, 2014 WI 132, ¶34, 359 Wis. 2d 454, 856 N.W.2d 834 ("[I]t is the State that bears the burden of proving the existence of exigent circumstances sufficient to justify a warrantless investigatory blood draw."); *State v. Kieffer*, 217 Wis. 2d 531, 541-42, 577 N.W.2d 352 (1998) (The State bears the burden of proving "by clear and convincing evidence" that a warrantless search "was reasonable and in compliance with the Fourth Amendment."); *see also Howes*, 373 Wis. 2d 468, ¶96 (Abrahamson, J., dissenting); *State v. Subdiaz-Osorio*, 2014 WI 87, ¶170, 357 Wis. 2d 41, 849 N.W.2d 748 (Abrahamson, C.J., dissenting); *State v. Mims*, No. OT 05-030, slip op. at ¶22 (Ohio Ct. App. Feb. 24, 2006) (State must show exigent circumstances existed by clear and convincing evidence.); *Commonwealth v. Gray*, 2019 PA Super 175, 211 A.3d 1253, 1261 (same); *State v. Morgan*, 440 P.3d 136, 138 (Wash. 2019) (same).

¶12    The United States Supreme Court has stated that "[i]n those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment *mandates* that they do so." *McNeely*, 569 U.S. at 152 (emphasis added); *see also Kennedy*, 359 Wis. 2d 454, ¶34 (holding that in determining whether a warrantless blood draw was constitutional, "we look to whether, under the totality of the circumstances, the police officers could reasonably have obtained a warrant" before ordering the blood draw). Adhering to this principle for the case now before us, we again note that it was not Hay's burden to show to the circuit court that exigent circumstances did not exist, but the State's

burden to demonstrate, by clear and convincing evidence, that the Brookfield police officers could not have reasonably obtained a warrant before the drawing of Hay's blood "without significantly undermining the efficacy of the search." The State failed to meet its burden.

¶13 On appeal, the State does not argue that exigent circumstances existed because of the risk of Hay's BAC dropping below the .02 threshold, but still being above .00, by the time of the blood draw. Rather, it states that "[w]hen there is a blood test indicating an alcohol concentration above .00, an expert may be able to estimate the person's blood alcohol concentration at an earlier time." *See **Dalton***, 383 Wis. 2d 147, ¶40 (recognizing that "experts can work backwards from the BAC at the time the sample was taken to determine the BAC at the time of the alleged offense"). The State instead focuses its argument only on the risk of Hay's BAC dropping to .00. The State suggests that with the PBT reading indicating a BAC around .032, there was a risk that if the blood draw was delayed for a warrant, Hay's BAC would drop to .00 before the draw could be performed, in which case there would be no way an expert could estimate if Hay's BAC was at or above .02 at the time of driving.[3] It is this circumstance, the State argues, that created an exigency justifying the drawing of Hay's blood without a warrant.

¶14 Significantly, the State contends that whether exigent circumstances exist to justify drawing a suspect's blood without a warrant should be analyzed only from the moment a defendant refuses to submit to a blood draw and not before. The

---

[3] There is no dispute that if Hay's BAC dissipated to .00, there would be no practical way to prosecute him for an alcohol-based OWI offense. We say "alcohol-based" because Hay could still be prosecuted, as he was, for having "a detectable amount of a restricted controlled substance," here cocaine, in his blood while driving. *See* WIS. STAT. § 346.63(1)(am). The record gives no indication, however, that Stommes had any reason to suspect, prior to the testing of Hay's blood sample, that Hay had a restricted controlled substance in his blood.

State cites no case law in support of this position but relies upon a driver's implied consent under WIS. STAT. § 343.305(2), (3)(a), stating that "Hay, like all drivers, impliedly consented to an officer's request for a blood sample when the officer had probable cause that he had operated with a prohibited alcohol concentration … in his blood." The State maintains that "[a] reasonable officer would believe that Hay would want to avoid revocation and other penalties for refusal" and, thus, would not withdraw his consent. This "reasonable belief" is seemingly not specific to Hay and, of course, would in every case justify an officer waiting until after a suspect refuses to submit to a blood draw before the officer considers beginning the effort to secure a warrant. Because significant time often passes between the time of arrest and the time of refusal, which frequently occurs, as in this case, after arrival at the health care facility, by the time of refusal, it may be too late to secure a timely warrant, yet had the officer begun the warrant process earlier, a response on the warrant application may well have been received from a judge before a blood sample could be drawn. So, in short, the rule sought by the State—that an officer never needs to consider beginning the warrant application process unless and until a suspect refuses a blood draw—will in some cases create exigent circumstances that would not have existed had the process been started earlier. As we have held, however, "the government cannot justify a search on the basis of exigent circumstances that are of the law enforcement officers' own making." *State v. Guard*, 2012 WI App 8, ¶30, 338 Wis. 2d 385, 808 N.W.2d 718 (2011) (citation omitted).

¶15    The problem with the State's proposed rule is that it is at odds with the exigent-circumstances analysis contemplated by *McNeely*. The *McNeely* Court was well aware that all fifty states have an implied consent law, similar to Wisconsin's, *see McNeely*, 569 U.S. at 161; nonetheless, the Court indicated that

the exigent-circumstances consideration is not just limited to the time period and circumstances following a suspect's refusal to submit to a blood draw:

> Consider, for example, a situation in which the warrant process will not significantly increase the delay before the blood test is conducted because an officer can take steps to secure a warrant *while the suspect is being transported to a medical facility* by another officer. *In such a circumstance, there would be no plausible justification for an exception to the warrant requirement,*

*id.* at 153-54 (emphasis added). Thus, the Supreme Court indicated that a court's exigent-circumstances analysis should consider whether law enforcement could have taken steps en route to a medical facility without significantly increasing the delay in procuring the blood sample. We are not at liberty to begin the exigency analysis at a point following a suspect's refusal to provide a blood sample where the Supreme Court has indicated it begins earlier. *See also* **Mitchell v. Wisconsin**, 139 S. Ct. 2525, 2537-38 (2019) (considering pre-blood draw factors in the exigency analysis); **Dalton**, 383 Wis. 2d 147, ¶¶45-48 (considering in the exigency analysis various law enforcement responsibilities officers prioritized over applying for a warrant in the two hours between the alcohol-related crash and the suspect's refusal to submit to a blood draw at the hospital); **Howes**, 373 Wis. 2d 468, ¶49 (suggesting that when an officer has probable cause of an OWI violation at the scene of a traffic stop and is transporting a suspect to the hospital for a blood draw, the exigency analysis will include consideration as to whether the officer "could have obtained a warrant on the way to the hospital").

¶16    As noted, the State's exigent-circumstances argument relies upon its position that the exigency analysis should begin at the point at which a suspect refuses to provide a blood sample. Because it does not sufficiently develop an alternative argument that exigent circumstances also existed to forego seeking a

warrant if we consider—as we do—circumstances prior to the refusal, it cannot meet its burden to demonstrate the existence of exigent circumstances justifying Stommes' failure to attempt to secure a warrant. *See Gaethke v. Pozder*, 2017 WI App 38, ¶36, 376 Wis. 2d 448, 899 N.W.2d 381 (noting that as the appellant, the State bears the burden of demonstrating that the circuit court erred). Nonetheless, we will consider whether drawing Hay's blood without a warrant was justified in light of all of the circumstances presented in the record.

¶17 While it was reasonable for Stommes not to have begun the warrant application process before handcuffing, searching, and securing Hay in Stommes' squad car, the record as it stands suggests there were other meaningful opportunities shortly after Hay's arrest during which Stommes could have begun the warrant application process without interfering with the timely securing of a blood sample (i.e., without "undermining the efficacy of the search," *McNeely*, 569 U.S. at 152) or compromising other important law enforcement responsibilities, *see Dalton*, 383 Wis. 2d 147, ¶¶45-51 (identifying law enforcement duties such as investigating an accident, keeping the scene safe, and attending to medical needs of the driver and passenger as priorities taking precedence, under the facts of that case, over applying for a blood-draw warrant).

¶18 When questioned by the circuit court, Stommes provided scant reason why he could not have filled out arrest-related paperwork, such as preparing a warrant affidavit, while having the backup officer on the scene search Hay's vehicle instead of performing the search himself. Stommes' identified "practice" of having the arresting officer, here, Stommes himself, personally search the vehicle makes sense and might well trump applying for a blood-draw warrant at that time where such officer would be more effective or efficient than another officer for the particular search, but there is no evidence of that here, as the evidence only shows

that the search was "for alcohol related items ... and [anything] … Mr. Hay needed from his vehicle." As the circuit court seemed to allude, there was no evidence presented that, in this particular instance, the law enforcement investigation would have been compromised in any way if the backup officer had searched Hay's vehicle while Stommes spent that time applying for a warrant.

¶19 Then, after the search of Hay's vehicle, both Stommes and the backup officer simply "wait[ed]" for a third officer to arrive on the scene to "sit" with Hay's vehicle until a tow truck arrived. We fully agree that "[w]hen presented with multifaceted and chaotic circumstances … law enforcement needs flexibility to determine its priorities" and we are "not in the business of second-guessing law enforcement's reasonable allocation of resources in a complex and evolving situation," such as in the circumstance of a motor vehicle accident with serious injuries. *See Dalton*, 383 Wis. 2d 147, ¶49. We also agree with the United States Supreme Court's statement in *Mitchell* that "exigency exists when (1) BAC evidence is dissipating and (2) some other factor creates *pressing health*, *safety*, or *law enforcement needs* that would take priority over a warrant application." *Mitchell*, 139 S. Ct. at 2537. As the circuit court observed in the case now before us, however, "this case is marked by the lack of complication and absence of chaos." Furthermore, the State has failed to demonstrate pressing health, safety, or law enforcement needs during this period of time between securing Hay in the squad car and the arrival of the third officer on the scene that would take priority over starting the warrant application process.

¶20 Stommes testified that it generally would take "[a]n hour, hour and a half" to get a warrant "from the time that [he] filled out the affidavit and warrant to the time [he] received the signed warrant back from the judge"; he did not testify that seeking a warrant would take sixty to ninety minutes of *his time* away from

securing the blood sample.[4] There is no evidence in the record suggesting Stommes would have had to drive anywhere in order to "fill[] out the [warrant] affidavit," as opposed to doing so from his squad car while the backup officer searched Hay's vehicle and/or while both he and the backup officer simply "wait[ed]" for the third officer to arrive on the scene. In this day and age, it may well be that Stommes could have completed his portion of the warrant application process from his squad car via computer or cell phone. *See McNeely*, 569 U.S. at 155 ("[T]echnological developments that enable police officers to secure warrants more quickly, and do so without undermining the neutral magistrate judge's essential role as a check on police discretion, are relevant to an assessment of exigency.").[5]

¶21 Of course, there is no evidence in the record definitively establishing the precise type of electronic capabilities available to Stommes at the time and location of Hay's arrest.[6] But there is also no evidence to indicate the blood draw would have been delayed in any way if Stommes had begun seeking a warrant while

---

[4] Other than evidence regarding Stommes filling out the warrant application and contacting the ADA, the State failed to present evidence as to what steps would have been involved in the warrant application process or how long such steps, including filling out the warrant application, would have taken.

[5] The *McNeely* Court also observed that:

> States have also innovated. Well over a majority of States allow police officers or prosecutors to apply for search warrants remotely through various means, including telephonic or radio communication, electronic communication such as e-mail, and video conferencing. And in addition to technology-based developments, jurisdictions have found other ways to streamline the warrant process, such as by using standard-form warrant applications for drunk-driving investigations.

*McNeely*, 569 U.S. at 154-55.

[6] We can reasonably assume, however, that Stommes and/or the backup officer would have had a means available to them by which they could call the ADA from the scene.

12

the backup officer searched Hay's vehicle and/or while both officers "wait[ed]" for the third officer to arrive on the scene. *Cf. **Dalton***, 383 Wis. 2d 147, ¶52 n.8 (considering the county's protocol for procuring a search warrant *as reflected in the record* "as part of the totality of the circumstances" leading the court to conclude exigent circumstances existed for a warrantless blood draw).

¶22 Here, the record indicates that upon arresting Hay for a violation of OWI, fifth offense, Stommes knew he was subject to a .02 BAC limit, and thus Stommes was undoubtedly aware at that time that he would be transporting Hay to the hospital for a blood draw. And as the circuit court found, due to Hay's apparently low BAC level at the time of arrest, Stommes knew he was "in a rush" to avoid complete dissipation of the alcohol in Hay's system. The record also suggests Stommes had time and opportunity shortly after the arrest to begin the search warrant process at that time without delaying the blood-draw effort or compromising other important law enforcement responsibilities. In light of these particular facts and circumstances, it was unreasonable for Stommes not to use this time and opportunity to begin the warrant application process. Significantly, as indicated, the *State* bears the "heavy burden" to show by clear and convincing evidence that exigent circumstances justified the officer's lack of effort to secure a warrant, *see **Welsh***, 466 U.S. at 749-50; ***Kieffer***, 217 Wis. 2d at 541-42; yet the State produced no evidence that it could not have reasonably begun the warrant application process shortly after Hay's arrest.

¶23 If the PBT reading was fairly accurate, as Stommes apparently assumed at the time of arrest and as the State assumes in its briefing on appeal, and if the alcohol in Hay's system dissipated at the higher-end rate of .02 percent per hour, a reasonable officer arresting Hay would have believed it would have taken over one hour and thirty minutes from the time of arrest for Hay's blood to dissipate

13

to .00. If the alcohol dissipated at a rate of .015 percent per hour, a reasonable officer would have believed it would have taken over two hours for his blood to dissipate to .00. Stommes was aware he could procure a warrant in "[a]n hour, hour and a half" from the time he began the warrant process. Thus, based on the facts as Stommes understood them at the time of Hay's arrest, a reasonable officer would have believed that had he begun the warrant process after securing Hay in his squad car, it is likely he would have received a response on the warrant application in time to draw Hay's blood before the alcohol in his system dissipated to .00.[7] Stommes unreasonably failed to seek a warrant after Hay was secured in his squad car and, with such failure, impermissibly created the exigency that existed after Hay later refused the blood draw. *See **Guard***, 338 Wis. 2d 385, ¶30.

¶24 All of this is not to say that exigent circumstances could not have arisen to justify the blood draw without a warrant. We agree that, with the low PBT reading of .032, a reasonable officer would have believed time was of the essence.

---

[7] Moreover, we note the circuit court's finding that "at no time did law enforcement present the exigency of the situation to a magistrate." Nor did Stommes suggest that any of the three or four prior instances in which he previously applied for a warrant, which took an "hour, hour and a half" to secure, were in circumstances like this one where time was particularly of the essence. Stommes provided no testimony suggesting the warrant effort could not have been expedited in a case such as this where a suspect was arrested for OWI fifth offense, there was a low PBT reading, and expedition was necessary to avoid complete dissipation. Although our decision does not rely upon it, we note, for example, that the circuit court stated:

> If an emergency warrant is required, nothing prevents law enforcement from contacting the on-duty judge on a recorded line pursuant to WIS. STAT. § 968.12(3) and presenting the situation to the judge without the standard affidavit, and seeking the magistrate's recorded, oral approval for the blood draw. Affidavits and warrants can be formalized, if necessary and as appropriate, *after* the judge approves the blood draw…. Presenting the warrant to the on-duty judge in this expedited manner would likely take no more than 10-15 minutes.

(Citation omitted.)

With that low of a reading, if Stommes had applied for a warrant shortly after arresting Hay and if a phlebotomist was available and prepared to draw his blood but a response on the application was held up due to the unavailability of a judge or other "delays from the warrant application process," Stommes would have been justified in directing the phlebotomist to draw Hay's blood. *See Dalton*, 383 Wis. 2d 147, ¶40; *see also McNeely*, 569 U.S. at 164 ("[T]he procedures in place for obtaining a warrant or the availability of a magistrate judge[] may affect whether the police can obtain a warrant in an expeditious way and therefore may establish an exigency that permits a warrantless search."); *Howes*, 373 Wis. 2d 468, ¶42.

¶25 Additionally, as Stommes testified, he became aware while at the hospital that there would be a delay in getting a phlebotomist to draw Hay's blood, likely because there was only "one phlebotomist at that time of night for the entire hospital."[8] Armed with the knowledge of the delay and the fact that there was only one phlebotomist on duty, had the phlebotomist presented herself to draw Hay's blood, it would have been reasonable for Stommes to direct that Hay's blood be drawn, even if he had not yet received a response to his warrant application. This would be so because of the significant uncertainty as to when the phlebotomist would again be available to draw Hay's blood after the warrant eventually arrived (assuming the judge signed it). *See id.*, ¶47 (indicating that uncertainty as to an officer's ability to obtain a blood draw at a future time is a consideration in the exigency analysis). In this scenario, at the time the phlebotomist appeared, Stommes would have been aware of the low PBT reading at the time of arrest, the rate at which alcohol dissipates, the time that had passed since that PBT reading,

---

[8] Because of the delay, blood was not drawn from Hay until 2:25 a.m., approximately thirty-five minutes after Stommes notified hospital staff that they were "at the emergency room area … [and] needed a phlebotomist to … do a blood draw." Stommes provided no testimony as to how long it normally takes for a blood draw to be performed after arriving with a suspect at the hospital.

and the uncertainty as to when he might again be able to secure the phlebotomist to draw Hay's blood if she left and began attending to other duties. Under such circumstances, exigent circumstances would have existed and Hay's blood properly could have been drawn without a warrant. Stommes, however, never applied for a warrant despite having reasonable opportunity to do so.

¶26 It is important to point out the limited nature of our holding in this case. For example, had Hay been subject to a .08 BAC limit instead of .02, the evidence available to Stommes at the time of arrest would not have provided probable cause to arrest Hay and seek a blood sample. Also, even with the .02 BAC limit, had Hay's PBT reading been significantly higher than .032, it would have been reasonable for Stommes to wait until after he requested a blood sample from Hay at the hospital before considering applying for a warrant in the event Hay refused, because with a significantly higher PBT reading, a reasonable officer would know he would still have sufficient time if Hay refused to then seek a warrant without risking Hay's BAC dropping to .00. But based upon the unique facts of this case, a reasonable officer would have known right at the time of Hay's arrest that time was of the essence and there likely would not be sufficient time to procure a warrant after a refusal at the hospital.

¶27 Based upon the record as the State presented it to the circuit court, we conclude the court did not err in determining the State failed to meet its "heavy burden" of demonstrating Stommes could not have reasonably obtained a warrant before drawing Hay's blood "without significantly undermining the efficacy of the search." *See McNeely*, 569 U.S. at 152; *Welsh*, 466 U.S. at 749-50. As a result, the Fourth Amendment "mandated" that Stommes attempt to procure a warrant when he had the reasonable opportunity to do so. *See McNeely*, 569 U.S. at 152.

*By the Court.*—Orders affirmed.