# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.:     2018AP2269-CR

†Petition for Review filed

Complete Title of Case:

STATE OF WISCONSIN,

PLAINTIFF-APPELLANT,

V.

YANCY KEVIN DIETER,

DEFENDANT-RESPONDENT. †

| | |
|---|---|
| Opinion Filed: | July 16, 2020 |
| Submitted on Briefs: | September 6, 2019 |

| | |
|---|---|
| JUDGES: | Blanchard, Graham, and Nashold, JJ. |

| | |
|---|---|
| Appellant<br>ATTORNEYS: | On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Michael C. Sanders*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |
| Respondent<br>ATTORNEYS: | On behalf of the defendant-respondent, the cause was submitted on the brief of *Andrew R. Hinkel*, assistant state public defender of Madison. |

# COURT OF APPEALS
# DECISION
# DATED AND FILED

## July 16, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.   **2018AP2269-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. **2017CF510**

**IN COURT OF APPEALS**

---

STATE OF WISCONSIN,

    PLAINTIFF-APPELLANT,

  V.

YANCY KEVIN DIETER,

    DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Monroe County: RICHARD A. RADCLIFFE, Judge. *Reversed*.

Before Blanchard, Graham, and Nashold, JJ.

¶1     GRAHAM, J.  Yancy Dieter faces criminal charges that include homicide by intoxicated use of a vehicle.  The circuit court granted Dieter's motion to suppress evidence of his blood alcohol concentration, which was obtained through a warrantless blood draw, and the State appeals.  Based on the totality of

the circumstances, we conclude that exigent circumstances justified the warrantless blood draw, and accordingly we reverse the suppression order.

## BACKGROUND

¶2 In the early morning hours of July 24, 2017, Dieter crashed his car in Monroe County. His leg was badly broken and his passenger was killed. The crash was not reported to law enforcement until several hours after it had occurred.

¶3 Sergeant Ryan Oswald from the Monroe County Sheriff's Department arrived at the scene of the crash at approximately 6:16 a.m. Oswald remained at the scene for approximately 27 minutes, and during that time, he did the following. He photographed the crash scene and determined the identity of the deceased passenger by reference to documents in his wallet. He spoke with the rescue technicians who were attending to Dieter's injuries, and he briefly spoke with Dieter, who said that he and his passenger had been driving home from a local tavern. He also interviewed two other witnesses who showed up at the scene. Based on information obtained in these interviews, Oswald concluded that the crash had occurred almost five hours earlier, at approximately 1:55 a.m.

¶4 Dieter was loaded into an ambulance and transported to a nearby hospital in Tomah, and Oswald followed, arriving at approximately 6:51 a.m. Oswald had learned from dispatch that Dieter had multiple prior OWI convictions, and that his license had been revoked. Shortly after Oswald arrived at the hospital, medical staff informed him that Dieter smelled strongly of intoxicants. Oswald also learned that an ambulance was on the way from Sparta and would arrive "soon" to take Dieter to a hospital 45 minutes away in La Crosse.

¶5 It is undisputed that by that time, Oswald had probable cause to believe that Dieter had been driving under the influence of alcohol, and that evidence of this crime would be found in Dieter's blood. Oswald went to his squad car to print out a citation and the "Informing the Accused" form.[1] He then returned to Dieter's hospital room, read the form to him, and asked Dieter for consent to draw a sample of his blood to test it for alcohol and controlled substances. Dieter refused, and Oswald recorded the time of refusal as 7:07 a.m.

¶6 Oswald later testified that, based on his experience, it would take at least 40 minutes to obtain a warrant from a judge authorizing a blood draw.[2] Additionally, based on his knowledge of the driving distance between Sparta and Tomah, he expected the ambulance to arrive for Dieter within the next 10 minutes. Oswald directed medical staff to draw a sample of Dieter's blood without a warrant, and the blood draw occurred between 7:20 and 7:25 a.m. Dieter was loaded into the ambulance shortly thereafter and driven to La Crosse. The test results later showed a blood alcohol concentration of .164, far above the legal limit.

¶7 The State charged Dieter with multiple counts, including homicide by intoxicated use of a vehicle, and Dieter moved to suppress the blood test evidence.

---

[1] The "Informing the Accused" form contains a statutory script that provides information about the legal consequences of consenting to chemical testing and the legal consequences of refusing. *See* WIS. STAT. § 343.305(4) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[2] Specifically, Oswald testified that it takes approximately five minutes to fill out a citation and 15 minutes to fill out the electronic warrant and affidavit form with information about the crash and the basis for probable cause. He further testified that it takes 20 minutes to contact the duty judge and read the warrant and affidavit verbatim to the judge. Finally, Oswald also testified that, in his experience, it would not have expedited the application process to ask for assistance from another officer, because relaying the required information and his observations to that officer would have added steps to the process.

The circuit court granted the motion, concluding that there were no exigent circumstances to justify a warrantless search. The State appeals.

## STANDARD OF REVIEW

¶8 An order granting or denying a suppression motion presents a question of constitutional fact, a mixed question of law and fact to which we apply a two-step standard of review. *State v. Tomaszewski*, 2010 WI App 51, ¶5, 324 Wis. 2d 433, 782 N.W.2d 725. "We review the circuit court's findings of historical fact under the clearly erroneous standard, and we review independently the application of those facts to constitutional principles." *Id.*

## DISCUSSION

¶9 The Fourth Amendment protects against "unreasonable searches and seizures" by the government, and blood tests to determine alcohol concentration are "searches" for Fourth Amendment purposes. U.S. CONST. amend. IV; *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2173 (2016). Searches conducted without a warrant are unreasonable unless they fall within a recognized exception to the warrant requirement. *Missouri v. McNeely*, 569 U.S. 141, 148 (2013). One exception is exigent circumstances, which exist when the exigencies of the situation "make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Id.* at 148-49. Exigent circumstances are generally determined "case by case based on the totality of the circumstances." *Id.* at 145; *see also* *State v. Dalton*, 2018 WI 85, ¶42, 383 Wis. 2d 147, 914 N.W.2d 120 (citing *McNeely*); *State v. Tullberg*, 2014 WI 134, ¶42, 359 Wis. 2d 421, 857 N.W.2d 120 (citing *McNeely*). It is the State's burden to prove the existence of exigent circumstances. *See McNeely*, 569 U.S. at 164.

¶10     The parties disagree about whether there were exigent circumstances in this case. The State contends that there were. It argues that the unusually long interval between the crash and the initial police response, as well as Dieter's imminent transport to La Crosse for medical care, created a "now or never" situation for taking a sample of Dieter's blood.[3] Dieter disagrees. Citing *McNeely*, 569 U.S. at 152, he argues that waiting an additional 40 minutes or an hour to obtain a warrant would not have "significantly undermined the efficacy of the search." He also contends that Oswald should have started the application process at the crash scene, which would have provided him with enough time to obtain a warrant before Dieter was transported to La Crosse.

¶11     We begin by discussing recent cases that set forth a "totality of the circumstances" framework for evaluating exigencies caused by the dissipation of alcohol in the bloodstream. We then apply this framework and explain why we conclude that the State has met its burden to show exigent circumstances under these specific facts.

¶12     Alcohol dissipates as it is absorbed in the bloodstream and metabolized; therefore, the passage of time between alleged intoxicated driving and the collection of a blood sample affects the quantity of alcohol that testing will reveal. *See, e.g.*, *McNeely*, 569 U.S. at 152. Wisconsin statutes recognize that the

---

[3] During the suppression hearing, Oswald testified that medical staff at the Tomah hospital were about to administer pain medication to Dieter, which could have degraded the evidentiary value of a blood sample. In its opening brief on appeal, the State contends that this fact supports a determination of exigent circumstances. Dieter responds that we should not consider this fact in our analysis because Oswald did not have probable cause to believe that Dieter had any controlled substances in his system. The State does not counter Dieter's argument in its reply, and we do not consider the alleged impending administration of pain medication in our analysis of the totality of the circumstances. *See* *United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in response brief may be taken as a concession). We express no opinion about the merits of the parties' arguments on this topic.

natural process of dissipation affects the evidentiary value of tests for blood alcohol concentration. Under WIS. STAT. § 885.235(3), if a blood sample is drawn three hours or later after an incident of alleged intoxicated driving, the test is admissible only if supported by expert testimony establishing its probative value. However, if the sample is drawn within three hours of the incident, it is admissible without expert testimony. *See* § 885.235(1g). For ease of reference throughout this opinion, we refer to this interval in § 885.235(1g) as the "three-hour window."

¶13 Because the natural dissipation of alcohol over time presents "a risk that evidence will be destroyed," the passage of time may help support an exigent circumstances determination in a given case. *Dalton*, 383 Wis. 2d 147, ¶40. Dissipation is important to an analysis of exigent circumstances, but it is not determinative, and it must be considered in context among all other relevant facts. *McNeely*, 569 U.S. at 165. In *McNeely*, the United States Supreme Court rejected the rule that had been applied in some jurisdictions, including Wisconsin, that natural dissipation creates a per se exigency permitting a warrantless blood draw whenever law enforcement has probable cause to believe an individual has been driving while intoxicated. 569 U.S. at 151-52. *McNeely* did not purport to analyze the significance of facts other than dissipation, but noted that "'special facts,' such as the need for the police to attend to a car accident," might also contribute to exigent circumstances. *Id.* at 164 (quoting *Schmerber v. California*, 384 U.S. 757, 771 (1966)). The test for exigency is satisfied when officers have probable cause to search and, based on the totality of the circumstances, they reasonably believe that obtaining a warrant for a blood test would "significantly undermin[e] the efficacy of the search." *Id.* at 152.

¶14 Following *McNeely*, the Wisconsin Supreme Court had two occasions to consider whether a warrantless blood draw was justified under circumstances

6

that, like here, involved an intoxicated driver who was conscious but severely injured after a car crash. *Tullberg*, 359 Wis. 2d 421; *Dalton*, 383 Wis. 2d 147. In both cases, the court considered the imminent closing of the three-hour window as part of its totality of the circumstances analysis. *Tullberg*, 359 Wis. 2d 421, ¶19 & n.7, ¶50 & n.26; *Dalton*, 383 Wis. 2d 147, ¶¶41, 52. Both cases also demonstrate how a combination of other events following a crash—such as police investigation at the scene, the medical needs of the persons involved in the crash, and the dissipation of alcohol—may weigh in favor of exigency. *Tullberg*, 359 Wis. 2d 421, ¶¶47-50; *Dalton*, 383 Wis. 2d 147, ¶¶44-52.[4]

¶15   With this legal framework in mind, we now address the parties' arguments about the totality of the circumstances in this case. The parties disagree about the point in time at which our analysis should begin. As noted above, Dieter argues that Sergeant Oswald should have taken steps to apply for a telephonic warrant shortly after he arrived at the crash scene. If Oswald had begun the warrant application at that time, Dieter argues, he would have had the warrant in hand by 7:07 a.m., when Dieter refused to consent to the blood draw. The State, by contrast, suggests that Oswald would not have had any reason to start the warrant application process until after Dieter refused to consent to a search.

¶16   The State may mean to argue that officers are never required to consider applying for a warrant until after a suspect refuses a blood draw. If so, we recently rejected a similar argument in *State v. Hay*, 2020 WI App 35, 392 Wis. 2d

---

[4] In a recent case addressing a warrantless blood draw from an unconscious driver, a plurality of the United States Supreme Court explained that "exigency exists when (1) [blood alcohol concentration] evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application." *Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2537 (2019). The State argues that this language from *Mitchell* supports its position in this case, but it does not suggest that *Mitchell* alters the totality of the circumstances test in cases like this involving conscious drivers.

7

845, 946 N.W.2d 190. As we explained in *Hay*, "significant time often passes between the time of arrest and the time of refusal," and "the rule sought by the State—that an officer never needs to consider beginning the warrant application process unless and until a suspect refuses a blood draw—will in some cases create exigent circumstances that would not have existed had the process been started earlier." *Id.*, ¶14.

¶17    However, we also disagree with Dieter's argument that Oswald was required to begin the process of obtaining a warrant shortly after he arrived at the crash scene.[5] When officers arrive at the scene of a crash, they may face pressing tasks that, at least at first, reasonably take priority over a warrant application. *See Tullberg*, 359 Wis. 2d 421, ¶49 (officer responding to crash scene reasonably prioritized addressing safety and generally gathering information at the scene); *Dalton*, 383 Wis. 2d 147, ¶47 (officer responding to crash scene reasonably prioritized caring for medical needs, examining and securing the scene, and interviewing a witness while the witness still could relate fresh memories). As our supreme court has explained, courts are "not in the business of second-guessing law enforcement's reasonable allocation of resources in a complex and evolving situation." *Dalton*, 383 Wis. 2d 147, ¶49.

¶18    Here, Oswald was present at the scene of the crash for less than a half hour. We conclude that during that relatively brief period of time, he reasonably prioritized tasks such as documenting the aftermath of the crash and speaking to

---

[5] Despite Dieter's argument to the contrary, it is not obvious to us that Oswald had probable cause to believe that a sample of Dieter's blood would contain evidence of intoxicated driving "within a minute" of arriving at the crash scene. The circuit court, too, appeared uncertain on this point, concluding that Oswald had probable cause "either at the scene or certainly by the time [Oswald] arrived at the hospital." We need not definitively resolve when Oswald had probable cause of intoxicated driving because our analysis does not hinge on this question.

witnesses at the scene while their memories were still fresh. This is not a case like *Hay*, where the officer unreasonably prioritized an automobile search that could have easily been performed by the other officer who was present at the scene, and then sat in his squad car while waiting for a third officer to arrive and tow the defendant's vehicle. *See Hay*, 392 Wis. 2d 845, ¶¶3-4, 18.

¶19 Based on the totality of circumstances in this case, we conclude that Oswald's first reasonable opportunity to apply for a warrant was at the time he arrived at the hospital in Tomah at approximately 6:51 a.m. And, from that point forward there is no indication of unreasonable delay. At that time, Oswald promptly took steps to determine whether Dieter would consent to a blood draw. It was reasonable for Oswald to follow the procedures in WIS. STAT. § 343.305(3)-(4) for obtaining voluntary consent, even though there was a chance that Dieter would refuse, as he ended up doing.

¶20 We further conclude that a reasonable officer in Oswald's position would have believed that applying for a warrant would significantly delay the blood draw and that he did not have time to obtain a warrant without "significantly undermining the efficacy of the search." *See McNeely*, 569 U.S. at 153. There are three reasons for our conclusion.

¶21 First, as summarized above, Oswald testified that based on his experience with the telephonic warrant application process in Monroe County, it would take at least 40 minutes to obtain a warrant. Although the circuit court suggested that a warrant could have been obtained "much earlier than 40 minutes," the question is what a reasonable officer in Oswald's position would have believed. To the extent the court suggested that the application process would have been expedited if Oswald had asked another officer for help, this belief is contrary to

Oswald's testimony and not supported by any evidence in the record. The court did not make any finding that Oswald was not credible, and no evidence introduced at the suppression hearing called into question the reasonableness of his belief that it would have taken at least 40 minutes to obtain a warrant.

¶22 Second, Oswald had been informed that an ambulance was on its way to transport Dieter to La Crosse, and he believed that the ambulance was likely to arrive within 10 minutes. Thus, Oswald had reason to believe that Dieter would be on the way to another hospital across the county line before any warrant could be issued. As the State notes, Dieter's impending transport complicated the police response. And even assuming that Oswald could have accompanied Dieter in the ambulance or coordinated with officers and medical staff in La Crosse County, the impending transport presented a risk that the delay would have been even longer than the 40 minutes Oswald testified was needed to obtain a telephonic warrant in Monroe County.

¶23 Finally, Oswald knew that the crash had occurred at 1:55 a.m., and that more than five hours had already passed since the crash. This unusually long delay, which occurred through no fault of the police, is a significant fact in our totality of the circumstances analysis, and it distinguishes this case from a "run-of-the-mill OWI investigation" where a warrant can often be obtained shortly after an incident of suspected intoxicated driving. *See, e.g.*, **Hay**, 392 Wis. 2d 845, ¶8 (addressing the State's claim of exigent circumstances in a "run-of-the-mill OWI investigation" where police had probable cause of intoxicated driving shortly after stopping Hay's vehicle).

¶24 Dieter argues, and the circuit court appeared to agree, that dissipation was no longer an urgent concern given the passage of time since the crash. Dieter

10

accurately cites *Tullberg* and *Dalton* for the proposition that the imminent closing of the statutory three-hour window favors an exigency determination. However, he argues that waiting for a warrant would have made no difference here, because the three-hour window had long since closed. As he explains, whether the blood was drawn in Tomah five-and-a-half hours after the crash or in La Crosse six-and-a-half hours after the crash, the blood alcohol evidence would not have been admissible without expert testimony.

¶25 We do not agree with Dieter's reasoning. For reasons we now explain, an objectively reasonable officer in Oswald's position would have believed that the unusually long interval since the crash made it all the more important to take a blood sample without further delay.

¶26 As acknowledged in *McNeely* and recognized by our statute establishing the three-hour window, a lengthy delay in collecting a sample reduces the probative value of the resulting chemical test. *See McNeely*, 569 U.S. at 152 ("a significant delay in testing will negatively affect the probative value of the results"); *id.* at 156 (long delays "may raise questions about the accuracy of the [blood alcohol] calculation"); WIS. STAT. § 885.235(1g), (3). Here, there had already been a significant delay, which occurred through no fault of the police. An objectively reasonable officer would have been concerned that *additional* delay to obtain a warrant, beyond the five hours that had already elapsed, would have further undermined the probative value of a test, possibly even rendering it inadmissible if an expert was not able to support its probative value.

¶27 On a related note, further delay risked the destruction of the blood alcohol evidence altogether. The dissipation rate is "gradual and relatively predictable." *McNeely*, 569 U.S. at 152. Therefore, experts can generally work

backwards from the time of the blood draw to determine what the driver's blood alcohol concentration would have been at the time of the alleged offense. *Dalton*, 383 Wis. 2d 147, ¶40. When the blood alcohol level drops to 0.00 grams per milliliter, however, it becomes "impossible to calculate what [a driver's] blood alcohol level was at the time of the accident," and the test loses all evidentiary value. *State v. Howes*, 2017 WI 18, ¶45, 373 Wis. 2d 468, 893 N.W.2d 812 (lead opinion); *see also Hay*, 392 Wis. 2d 845, ¶13 n.3. As the circuit court recognized, alcohol generally dissipates in the blood at a rate of .015 to .02 per hour, meaning that in the five hours following the crash, Dieter's blood alcohol level had likely already dissipated by almost 0.10. At the time of the blood draw here, an objectively reasonable officer would have been concerned that there was a significant risk that Dieter's blood alcohol level might have been at or nearing 0.00, even if it had been significantly over the legal limit at the time of the crash.

¶28     Dieter argues that this possibility "cuts both ways." Because there was a "good chance" his blood alcohol level had already reached 0.00, he reasons that there was "ample reason to doubt that any evidence was being destroyed." But the possibility that evidence may have already been destroyed does not reduce the urgency of preserving it if it still exists.

¶29     Dieter contends that the State is arguing in favor of a rule, contrary to *McNeely*, that "the natural dissipation of alcohol in the blood stream is a *per se* exigency" because there is "always a good chance" that a person's blood alcohol concentration will drop to 0.00. Dieter mischaracterizes the State's argument, and our conclusion. As we have explained, the risk of destruction of blood alcohol evidence here was especially heightened due to the unusually long delay between the crash and law enforcement's first encounter with Dieter. Thus, our conclusion is a far cry from a per se rule that would apply in other cases, such as a run-of-the-

mill OWI investigation in which police encounter the driver at the time the driver is still operating a vehicle or shortly thereafter.

¶30    For all these reasons, we conclude that an objectively reasonable officer in Oswald's position would have believed that a delay of even 40 minutes to obtain a warrant before ordering a blood draw would have "significantly undermin[ed] the efficacy of the search." *McNeely*, 569 U.S. at 152. Thus, exigent circumstances justified the warrantless blood draw.[6]

## CONCLUSION

¶31    Based on the totality of the circumstances, we conclude that evidence of Dieter's blood alcohol level should not have been suppressed. Accordingly, we reverse.

*By the Court.*—Order reversed.

---

[6] In its oral ruling, the circuit court commented on several actions that the court thought Sergeant Oswald could have taken to secure a warrant despite Dieter's imminent transfer to La Crosse. The court hypothesized that Oswald could have reasonably attempted to delay the transfer. But it is undisputed that Dieter was seriously injured in the crash, and medical staff had determined that his medical needs would be better served in the La Crosse hospital. As the *Dalton* court noted, it is reasonable for officers to prioritize "safety and medical needs over a warrant application." 383 Wis. 2d 147, ¶51. The court also hypothesized that Oswald could have accompanied Dieter in the ambulance and applied for a warrant on the way to La Crosse. But even if this is a reasonable scenario to imagine, as we have explained, an officer in Oswald's position would reasonably have believed that a 40-minute delay risked the destruction of evidence. The logistical difficulties presented by the transfer to La Crosse certainly heightened that concern, but there were already exigent circumstances for a warrantless blood draw at the time that it was taken in the Tomah hospital.