STATE OF WISCONSIN, Plaintiff-Respondent,

v.

ANTHONY D. GUARD, Defendant-Appellant.

Court of Appeals

*No. 2011AP72–CR. Submitted on briefs September 29, 2011.
—Decided December 20, 2011.*

2012 WI App 8

(Also reported in 808 N.W.2d 718.)

385

387

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Richard L. Zaffiro* of Wauwatosa.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general and *Sarah K. Larson*, assistant attorney general.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. KESSLER, J.  Anthony D. Guard appeals a judgment of conviction after pleading guilty to one

count of being a felon in possession of a firearm and one count of cocaine possession with the intent to deliver. Guard argues that the trial court erred in denying his motion to suppress evidence because evidence against him was obtained by a warrantless entry, without exigent circumstances, without consent to enter his duplex, and without plain view of criminal activity prior to the warrantless entry. Because we conclude that evidence against Guard was obtained as a result of an unlawful warrantless entry, we reverse the trial court and remand for further proceedings.

## BACKGROUND

¶ 2. According to testimony from Guard's suppression hearing, Police Officers Ryan DeWitt and Eric Rom went to the duplex located at 2432 N. 35th Street in Milwaukee on June 17, 2009, in response to a dispatch about armed drug dealing. Rom testified that a complaint had been called in to Milwaukee police naming Guard as the suspected armed dealer at the duplex. Rom testified that upon approaching the duplex, he saw two women sitting on the front porch with the front door open:

> [Rom]:  As we approach the house, I believe it was two women sitting on the front porch with their front door open.
>
> Right away I'm like "How are you doing? Is there an Anthony here?"
>
> And they're like, "Anthony?"
>
> I'm like, "Yeah. We got sent here for an Anthony. Is there an Anthony here?"
>
> And she's like, "No, it's just us. You probably want the back door," and reaches back and just kind of points over her head.

[Prosecutor]:   What did you do after she did that?

[Rom]:   Well, first like I thought there was only one door. I was like, "Where is the door?"

    She's like, "Oh, it's around back. You can use the hallway there."

    . . . .

    So we proceed to walk towards the side of the house.

On cross-examination, Rom testified as follows:

[Defense counsel]:   You talked to that woman on the front steps. Did you ever find out if she lived in that apartment?

[Rom]:   I actually talked to two women—

[Defense counsel]:   Did you find out if either one of them–

[Rom]:   I know initially one of them said she lived there. I'm not sure if the other one did, or not.

[Defense counsel]:   After all this was done, was there any further discussion or talk with these women [from the front step]?

[Rom]:   ... Honestly, no[.]

Rom's testimony does not establish whether the woman who directed him to the side entrance is the woman who claimed to be a resident of the duplex. DeWitt testified that he did not speak to the women at all and was unsure of the conversation between Rom and the women. Neither woman testified at the hearing.

¶ 3.   While approaching the side of the house, the officers encountered three individuals who had exited from the side entrance. Rom testified that the officers

stopped the three individuals because they had "a cloud of smoke around [them]. You could just see it and you could just smell all the odor of burnt marijuana from these three individuals . . . as they're walking out the door." After the officers asked the individuals whether any of them was Anthony—they all responded "[n]o"— and whether any of them had weapons in their possession, the individuals consented to a search. The officers patted the individuals down. Nothing was found during the pat downs. A third dispatched officer stayed with the individuals as DeWitt and Rom then proceeded to the side entrance, the only entrance for the upper unit.

¶ 4. Both officers testified that they could smell burnt marijuana outside of the duplex as they approached the side entrance. DeWitt testified that the side entrance consisted of two doors—a solid interior door and a security door with metal bars in front of the interior door. The metal bars extended over the entire length of the interior door. Dewitt further testified that the interior door was ajar about four or five inches. The security door was "shut all the way" but was not locked. The metal bars of the security door did not have glass behind them. The officers could smell marijuana emanating from the house and could hear conversations and laughter from the upstairs portion of the duplex, however they could not see up the stairway or into the upper duplex. From their position outside, through the four or five inch opening of the interior door, they could only see the stairway to the basement. DeWitt testified that the side entrance was the only entrance leading to the upper unit.

¶ 5. The officers opened the closed security door, further opened the interior door, and entered the back hallway of the duplex. The hallway connected both the upper and lower units with the basement. DeWitt went

393

into the basement. He stated that "[i]t was clear that that wasn't the point where the marijuana smoke was coming from." He tried to open the door to the lower unit of the duplex, which was locked.

¶ 6.   The officers then went up the stairs to the upper unit. DeWitt stated that the staircase leading to the upper unit "[wound] around," and that the marijuana odor got stronger as the officers went up the stairs. He further stated that the officers continued to hear a "party ruckus" as they proceeded up the stairs. Rom stated that the occupants of the upper unit were probably unaware of police presence "because it sounded like normal conversation. The tone didn't change from like normal conversation . . . . It continued actually as we were going up the stairs." Upon reaching the landing, the officers saw that the door to the upper unit was fully open. Four people were seated around a kitchen table, with Guard seated closest to the door.

¶ 7.   DeWitt entered the unit first. He saw Guard holding a marijuana cigarette and two green "gem packs"[1] filled with what the officer thought was marijuana. Rom followed and noticed the handle of a handgun on top of a refrigerator within Guard's reach. DeWitt testified that the individuals in the upper unit "looked to be pretty shocked" when the officers entered. In addition, when Rom said "Police. Put your f[——] hands up[,]" he believed that "everybody seemed to be startled."

¶ 8.   Guard was taken into custody. DeWitt found twenty suspected corner cuts of cocaine while patting Guard down. Guard was subsequently charged with

[1] Gem packs "are small translucent . . . plastic bags used to package cocaine base." *See United States v. Robinson*, 30 F.3d 774, 779 n.1 (7th Cir. 1994).

possession of a firearm by a felon and possession of cocaine with intent to deliver. Guard filed a motion to suppress all evidence obtained as a result of the officers' warrantless entry into the duplex. The trial court denied the motion, finding the officers' warrantless entry reasonable "under all the circumstances." Specifically, the trial court made findings as to the nature of the back hallway, whether the officers had consent to enter the duplex, and whether the officers had probable cause to enter the duplex without a warrant.

¶ 9.  Regarding the back hallway, the trial court stated:  "that certainly is a common hallway. It is not exclusive to any resident. There was an access to the common basement. There was access to the first floor. There was access to the second floor apartment; and so that is a common hallway." The trial court also found that the side entrance to the duplex had both a closed security door and a solid interior door, the latter of which was open enough for the officers to see into the common basement.

¶ 10.  Regarding whether the officers had consent to enter the back hallway, the court said:

> And the women outside on the porch didn't know an Anthony and pointed to go around to the back . . . they kind of pointed back and up to other tenants.
>
> . . . .
>
> [T]he fact that it was a common hallway [,] if there was any consent, certainly I think the action of the women on the front porch could be interpreted as consent.
>
> I think it [is] reasonable to conclude they said, "Go ahead, go in the back. That is where you would find the

upper apartment,"[2] and since this is a common hallway, they would have []the ability to consent also.

¶ 11.   The trial court also found that probable cause existed to allow the officers to enter the duplex, stating:

> [T]hey had already confronted the women on the front porch and knew that the subject of their complaint was not in that location.
>
> They had encountered three individuals who had come out of that door who had a strong odor of marijuana who said they had been smoking . . . .
>
> I think they had probable cause to enter to follow that and to follow both the dispatch and to follow the odor that they smelled.

¶ 12.   Guard pled guilty to the charges. He was sentenced to three years of initial confinement and four years of extended supervision on each count, concurrent with each other but consecutive to any other sentence. This appeal follows pursuant to Wis. Stat. § 971.31(10) (2009–10) (motion to suppress may be challenged on appeal after entering guilty plea).[3]

¶ 13.   On appeal, Guard argues that the police were not authorized to enter the duplex because he had a reasonable expectation of privacy in the only entrance to his dwelling. He also argues that the officers entered

---

[2] We have searched the record and find no evidence that either woman ever said, "Go ahead, go in the back. That is where you will find the upper apartment[.]" The only evidence of what was said is Rom's testimony. Consequently, the trial court's conclusion as to the specific statement is not supported by the record.

[3] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

the hallway without a search warrant, without consent to enter the building, and without exigent circumstances. The State responds that Guard did not have a reasonable expectation of privacy in the common area of the duplex, thus permitting police entry regardless of whether police had a warrant. The State also contends that the officers had valid third-party consent to enter the hallway from the woman on the porch. Once inside, the State contends that exigent circumstances (the plain view of contraband and a weapon from the top of the stairs) justified the warrantless entry into the upper unit of the duplex.[4]

## STANDARD OF REVIEW

¶ 14. "When we review a [trial] court's ruling on a motion to suppress evidence, we apply the clearly erroneous standard to the [trial] court's findings of fact." *State v. Smiter*, 2011 WI App 15, ¶ 9, 331 Wis. 2d 431, 793 N.W.2d 920 (Ct. App. 2010). "However, we review the [trial] court's application of constitutional principles to the findings of fact *de novo.*" *Id.* (emphasis added). Whether a search or seizure has occurred—and if so, whether it passes constitutional muster—are questions of law, subject to independent review. *See, e.g., State v. Hughes*, 2000 WI 24, ¶ 15, 233 Wis. 2d 280, 607 N.W.2d 621; *State v. Robinson*, 2010 WI 80, ¶ 22, 327

---

[4] We agree with the State to this extent: If the police had a right to be in the back hall, they encountered exigent circumstances when they discovered, in plain view inside Guard's dwelling, illegal activity (the consumption of marijuana), probable contraband (the packets they believed contained marijuana) and a weapon within Guard's reach. The issue in this appeal, however, is whether the officers had a right to enter the building and thus to be in the back hall.

Wis. 2d 302, 786 N.W.2d 463. "The Fourth Amendment to the United States Constitution and article I, section eleven of the Wisconsin Constitution both protect citizens from unreasonable searches." *Smiter*, 331 Wis. 2d 431, ¶ 10. "Unless an exception applies, a search without a warrant is *per se* unreasonable." *Id.* (emphasis in *Smiter*). "These exceptions are 'jealously and carefully drawn,' and the burden rests with those seeking exemption from the warrant requirement to prove that the exigencies made that course imperative." *State v. Lee*, 2009 WI App 96, ¶ 6, 320 Wis. 2d 536, 771 N.W.2d 373 (citation and one set of quotation marks omitted).

## DISCUSSION

¶ 15.   It is undisputed that Rom and DeWitt did not have search warrants prior to entering the only entrance to Guard's unit. Consequently, the State had the burden of proving an exception to the warrant requirement at the time the police opened the exterior security door and entered the back hallway. *See Smiter*, 331 Wis. 2d 431, ¶ 10.

### A.   *Reasonable Expectation of Privacy.*

¶ 16.   In order for the Fourth Amendment's warrant requirement to apply, the defendant must first have a reasonable expectation of privacy in the property or location. *See State v. Rewolinski*, 159 Wis. 2d 1, 12, 464 N.W.2d 401 (1990). The State argues that Guard did not have a reasonable expectation of privacy in the common hallway, thereby justifying the officers' warrantless entry into his dwelling area. "[W]hether a person has a reasonable expectation of privacy seems by its very nature to

call for an examination of the particular facts of each case." *State v. Trecroci*, 2001 WI App 126, ¶ 33, 246 Wis. 2d 261, 630 N.W.2d 555. "The Fourth Amendment accords the highest degree of protection to a person's home." *Id.*, ¶ 41. A person's expectation of privacy in his or her dwelling extends to the curtilage of the dwelling. *See State v. Davis*, 2011 WI App 74, ¶ 9,333 Wis. 2d 490, 798 N.W.2d 902.

■■

¶ 17.   "[A] criminal defendant bears the burden of establishing both that he manifested a subjective expectation of privacy that was invaded by government action and that that expectation was legitimate. The burden of proof applicable is by a preponderance of the credible evidence." *Rewolinski*, 159 Wis. 2d at 16. "Whether a defendant had a legitimate expectation of privacy depends upon the totality of the circumstances." *Id.* at 17. Our supreme court recognized "the following elements as relevant" to determining whether a defendant had a legitimate expectation of privacy:

> (1) whether the defendant had a property interest in the premises; (2) whether he was legitimately (lawfully) on the premises; (3) whether he had complete dominion and control and the right to exclude others; (4) whether he took precautions customarily taken by those seeking privacy; (5) whether he put the property to some private use; and (6) whether the claim of privacy is consistent with historical notions of privacy.

*Id.* at 17–18 (parenthesis in *Rewolinski*). "This list of factors is neither controlling nor exclusive. Rather, the totality of the circumstances is the controlling standard." *State v. Thompson*, 222 Wis. 2d 179, 186–87, 585 N.W.2d 905 (Ct. App. 1998).

¶ 18.   Applying those relevant factors, the facts in the record establish that:   (1) Guard, as a resident of the

duplex, had a property interest in the premises; (2) Guard was lawfully in the duplex; (3) Guard, as a resident, had the same right as other residents to control access to his dwelling;[5] (4) the only entrance to his dwelling was the side entrance, which also provided access to the back entrance to the lower unit and gave both units access to the basement; (5) the existence of a closed exterior security door blocking entrance from the outside to the common hallway demonstrates control of access to his dwelling; (6) there is no evidence the tenant in the lower unit had a key to access the back hall through the security door and the interior door; and (7) Guard's possible allowance of others to enter *with his permission* (e.g. a pizza delivery person, or a UPS delivery person) does not transfer the only entrance to his dwelling to an area freely accessed by all in the duplex, much less by the general public. *See Trecroci*, 246 Wis. 2d 261, ¶ 39 (Allowing "third parties to enter and use the stairway" with the consent of the owner or tenant "alone does not negate a reasonable expectation of privacy."); *see also State v. Peck*, 143 Wis. 2d 624, 638, 422 N.W.2d 160 (Ct. App. 1988) (An inquiry into a person's reasonable expectation of privacy should focus not on "the ability of third parties to gain access to or view the property[,] but rather the manner in which the possessor holds the property out to the public.").

¶ 19.    The doors also manifest a reasonable precaution of privacy. The reasonable precaution of a closed exterior security door, and its evidence of an expectation of privacy, is not negated by the fact that

---

[5] There is evidence Guard lived in the duplex unit with his girlfriend and her cousin. This does not impact the analysis of Guard's Fourth Amendment rights or whether he had a reasonable expectation of privacy in the only entrance to the upper unit.

the interior entrance door happened to be open a few inches. An opening of four or five inches between an interior solid door and an exterior barred security door hardly creates an open invitation of "unfettered access" to the general public. *See Trecroci*, 246 Wis. 2d 261, ¶ 35 (where there was no "suggestion from the evidence that third parties had unfettered access to the stairway[,]" the defendants "exhibited an actual subjective expectation of privacy").

¶ 20. Further, Guard put the duplex unit to private use as his dwelling. At the time of these events, he was involved in a social encounter. His possible use of the premises for an illicit commercial enterprise does not necessarily trump an otherwise legitimate expectation of privacy. In *Trecroci*, we discussed the defendant's expectation of privacy in a locked attic used for the illegal growing of marijuana. *See id.*, ¶ 42. We held that parties involved in a commercial enterprise—even an illicit one—may have a reasonable expectation of privacy subject to Fourth Amendment protection. *See id.* ("The commercial use of a property reduces, but does not eliminate, the expectation of privacy.").

¶ 21. Finally, the demonstrated assertion of control of physical access to entry to Guard's dwelling is consistent with historical notions of privacy. Regardless of whether the door providing access to a person's home is locked, it is hard to imagine any person expecting an invasion of that sanctuary by uninvited visitors. *See State v. Ferguson*, 2009 WI 50, ¶ 17, 317 Wis. 2d 586, 767 N.W.2d 187 (There is an "overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic. Indeed, it is axiomatic that the physical entry of the home is the

chief evil against which the wording of the Fourth Amendment is directed.") (quotation marks, citations and brackets omitted).

¶ 22. Under all the circumstances present here, considering particularly the relevant factors identified in *Rewolinski*, we conclude that Guard had a reasonable expectation of privacy not merely in his unit, but also in the only entrance to his unit, which was the back hallway. Consequently, in the absence of consent to the entry or exigent circumstances, the warrantless entry by the police into that back hallway was a violation of Guard's rights under the Fourth Amendment of the United States Constitution and article I, section 11 of the Wisconsin Constitution.[6]

**B. Consent.**

¶ 23. Once a reasonable expectation of privacy has been established by the defendant, a warrant is required to justify a search, unless the State can establish a recognized exception to the warrant requirement. *See State v. Payano–Roman*, 2006 WI 47, ¶ 30, 290 Wis. 2d 380, 714 N.W.2d 548. The State has the burden of proving such an exception by clear and convincing evidence. *See State v. Kieffer*, 217 Wis. 2d 531, 541, 577 N.W.2d 352 (1998). One of the exceptions to the warrant requirement is "valid third-party consent." *Id.*

---

[6] *See State v. Rutzinski*, 2001 WI 22, ¶ 13, 241 Wis. 2d 729, 623 N.W.2d 516 (We consistently "conform[] our interpretation of Article I, Section 11 and its attendant protections with the law developed by the United States Supreme Court under the Fourth Amendment.").

402

¶ 24.   The authority to consent to search does not depend on legal property rights, but rather on the "consenting individual's relationship to the premises to be searched." *Id.* at 542. The authority " 'rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.' " *Id.* (citation omitted). Determining whether police had consent to enter is measured by an objective standard:   " 'would the facts available to the officer at the moment . . . warrant a (person) of reasonable caution in the belief that the consenting party had authority over the premises?' " *Id.* (citation omitted; ellipses and parentheses in *Kieffer*).

¶ 25.   Rom admitted that he was unsure whether both women on the porch resided at the duplex and that no further conversation took place with them after Rom was directed to the side entrance. DeWitt neither spoke with the women, nor heard the conversation between Rom and the women. The officers did not ask either woman her name, nor did they make even minimal efforts to verify that one of the women was, in fact, a resident of the duplex. Nor does the record establish that the woman who may have lived in the duplex is the same person who said the door to the upper unit was "around back," and the officers could "use the hallway there." The record does not establish that the officers knew of any connection between the woman identifying the side entrance and Guard; in fact, she did not even know Guard's name.

¶ 26. Nor does the record support the trial court's conclusion that the woman had the authority to consent to the search because the stairs leading to the upper unit were contiguous with a stairway to the basement shared with the lower unit, making the entire stairway "a common stairway."[7] Authority to consent to a search does not merely depend upon whether one place is geographically contiguous to another, but rather whether the occupants of the building actually freely use the contiguous spaces. *See id.*; *State v. Tomlinson*, 2002 WI 91, ¶ 23, 254 Wis. 2d 502, 648 N.W.2d 367.

¶ 27. There is no evidence in the record before us that the woman actually used either the side entrance or the back stairs. The side entrance provided access to the back stairs, according to the record before us, which was the only means of access to the upper unit. The side entrance, as we have discussed, was actually two doors—a solid interior door and a full-size exterior security door with metal bars. There is no evidence in the record that the woman providing directions to the side entrance had a key to those doors, or that she ever used those doors to access the basement, much less to access the upper unit or the first-floor unit. The State has not established on this record by clear and convincing evidence that the woman who gave the police information about the back stairs as the way to access the upper unit also had the authority to consent to police entry to the only means of access to that upper unit. *See*

---

[7] The trial court concluded with respect to the back entrance and related stairs: "It is not exclusive to any resident. There was an access to the common basement. There was access to the first floor. There was access to the second floor apartment; and so that is a common hallway." The trial court made no findings relative to the use to which the area was actually put.

*Trecroci*, 246 Wis. 2d 261, ¶¶ 6, 39–40 (In the context of an identifiable marijuana smell apparently emanating from an attic, the owner/occupant of a residential building did not have the authority to consent to a search of the locked attic rented to third parties but accessed from the same locked stairway as two other apartments.); *see also Kieffer*, 217 Wis. 2d at 542–47 (father-in-law had no actual authority to consent to search of loft area rented by daughter and son-in-law where there was no established mutual use of the loft area and where officers made no inquiries as to father-in-law's access to the area).

¶ 28.  "The United States Supreme Court has recognized that even if a third party lacks actual common authority to consent to a search of the defendant's residence, police may rely upon the third party's apparent common authority to do so, if that reliance is reasonable." *Kieffer*, 217 Wis. 2d at 548. "The question for the courts is whether the information available to the police officers at the time of the search would justify a reasonable belief that the party consenting to the search had the authority to do so." *Id.* "The [*Illinois v. Rodriguez*, 497 U.S. 177 (1990)] court cautioned that officers may not always take third-party consent to a search at face value, but must consider the surrounding circumstances. That consideration often demands further inquiry." *Id.*, 217 Wis. 2d at 549. As we have discussed, the officers made no inquiries beyond whether the women knew "Anthony," (they did not) and how the officers could access the upper unit. The extent of the officers' knowledge about the women was based on the following conversation, described in its entirety, by Rom:

[I said to the woman] "[w]e got sent here for an Anthony. Is there an Anthony here?"

And she's like, "No, it's just us. You probably want the back door," and reaches back and just kind of points over her head.

. . . .

Well, first like I thought there was only one door. I was like, "Where is the door?"

She's like, "Oh, it's around back. You can use the hallway there."

. . . .

So we proceed to walk towards the side of the house.

¶ 29. We conclude that the record does not establish by clear and convincing evidence that the information known to the officers about the women at the time the officers moved toward the side entrance supports an objective reasonable belief that the unidentified woman, who may or may not have lived in the duplex, had the apparent authority to give permission to enter the duplex.

### C. Probable Cause and Exigent Circumstances.

██ ██

¶ 30. Wisconsin and the United States Supreme Court "have recognized exceptions to the warrant requirement where the government can show both probable cause and exigent circumstances that overcome the individual's right to be free from government interference." *Hughes*, 233 Wis. 2d 280, ¶ 17; *see also State v. Garrett*, 2001 WI App 240, ¶ 9, 248 Wis. 2d 61, 635 N.W.2d 615. There are four exigent circumstances which may justify a warrantless search: "(1) an arrest made in 'hot pursuit,' (2) a threat to safety of a suspect or others,

(3) a risk that evidence will be destroyed, and (4) a likelihood that the suspect will flee." *State v. Kiekhefer*, 212 Wis. 2d 460, 476, 569 N.W.2d 316 (Ct. App. 1997) (citations and one set of quotation marks omitted). However, "the government cannot justify a search on the basis of exigent circumstances that are of the law enforcement officers' own making." *Id.*

¶ 31.  The State relies on the second and third types of exigent circumstances, arguing that when the officers were at the top of the stairs to the upper unit, their plain view of a weapon and drugs demonstrated exigent circumstances because Guard had easy access to a gun, which posed a threat to the safety of police and others, and because the drugs observed could be destroyed easily.

¶ 32.  We assume without deciding that the combination of the information in the dispatch, the burnt marijuana odor emanating from the duplex, and the encounter with the three individuals who had admitted to smoking marijuana, combine to constitute probable cause to enter the duplex. However, prior to entering the duplex and going up the only access way to the upper unit, there were no exigent circumstances. Both probable cause and exigent circumstances are necessary for a warrantless entry. *See Garrett*, 248 Wis. 2d 61, ¶ 9.

¶ 33.  The record demonstrates no exigent circumstances at the time the officers opened the closed security door, pushed the interior door open beyond the four or five inch opening that existed, and entered the back hallway. The officers were not in "hot pursuit" of anyone. Nothing in the record suggests that the three individuals the officers encountered outside of the duplex had any connection to Guard. In fact, the officers did not believe the individuals presented a threat to their safety. Rom

407

testified that he did not "find anything that . . . concerned [him] with them." Nor does the record suggest that Guard could have escaped from the duplex without the officers' knowledge because the officers had control of the only means of access to the upper unit.

¶ 34. There is no evidence in this record that Guard or his companions were aware of police presence when the officers opened the closed security door, when they explored the basement, when they checked the door to the first floor, or when they climbed the stairs. Both officers testified that Guard and his companions seemed unaware of police presence until the officers actually entered the upper unit and announced themselves. DeWitt testified that he heard loud voices and conversation while he and Rom were outside of the duplex, that he could continue to hear the "party ruckus" while proceeding up the stairs, and that Guard and his companions looked "pretty shocked" upon seeing the officers. Rom testified that he could hear "people having fun, a little laughter . . . [and] conversation" before entering the duplex, that "[i]t continued . . . as we were going up the steps," and that this "normal conversation" led him to believe that none of the occupants of the upper unit were aware of police presence. He further stated that Guard and the other occupants appeared "startled" when the officers announced themselves. The record establishes by clear and convincing evidence that the occupants of the upper unit were unaware of the officers' presence, and that neither a reasonable perception of a threat to the officers' safety, nor a reasonable concern about the destruction of evidence, existed until the officers actually reached the top of the stairs leading to the upper unit and announced themselves.

¶ 35. Neither officer claims to have seen either weapons or contraband in the duplex before they

408

reached the top of the stairs leading to the upper unit. The officers were not even certain that Guard was in the upper unit of the duplex, thus could hardly have been concerned that he might flee. Thus, the State has not established exigent circumstances that excuse the need for a warrant at the time the police opened the security door and entered the back hallway.

¶ 36. We agree with the State that by the time the officers reached the upstairs landing and were outside of Guard's unit, what they saw in plain view (a weapon and contraband) constituted exigent circumstances which justified a warrantless search *at that point in time*. However, those exigent circumstances were solely the result of the officers' earlier warrantless entry into the duplex through the side entrance. That entry was their intentional act. The record does not establish by clear and convincing evidence that a person with authority—actual or apparent—consented to police entry into the duplex. The record does not provide any reason why police, who had control of the only means of entry or exit from the upper unit, could not have obtained a warrant.

## CONCLUSION

¶ 37. For all the foregoing reasons, we reverse the judgment of conviction and remand for further proceedings consistent with this opinion.

*By the Court.*—Judgment reversed and cause remanded for further proceedings.