**2022 WI App 18**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

| | |
|---|---|
| Case No.: | 2020AP1808-CR |

Complete Title of Case:

**STATE OF WISCONSIN,**

      **PLAINTIFF-RESPONDENT,**

   **V.**

**ERIC D. BOURGEOIS,**

      **DEFENDANT-APPELLANT.**

| | |
|---|---|
| Opinion Filed: | March 23, 2022 |
| Submitted on Briefs: | September 30, 2021 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Gundrum, P.J., Neubauer and Grogan, JJ. |
|    Concurred: | |
|    Dissented: | |

| | |
|---|---|
| Appellant<br>ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Law Offices of James A. Walrath, LLC*, Milwaukee. |
| Respondent<br>ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sonya K. Bice*, assistant attorney general and *Joshua L. Kaul*, attorney general. |

COURT OF APPEALS
DECISION
DATED AND FILED

March 23, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1808-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2016CF929**

IN COURT OF APPEALS

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

ERIC D. BOURGEOIS,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Waukesha County: LAURA F. LAU, Judge. *Judgment affirmed in part; reversed in part; order reversed and cause remanded with directions*.

Before Gundrum, P.J., Neubauer and Grogan, JJ.

¶1 GUNDRUM, P.J. The Fourth Amendment is about balance—as relevant here, balancing the government's legitimate interest in public safety and security, which requires efficient, effective, and sometimes aggressive law

enforcement, with the individual's interest in not having his or her bodily integrity, residence, or personal effects intruded upon through generally well-meaning but occasionally overzealous law enforcement efforts. *See*, e.g., ***Vernonia Sch. Dist. 47J v. Acton***, 515 U.S. 646, 652-53 (1995) ("[T]he ultimate measure of the constitutionality of a governmental search is 'reasonableness.' … [W]hether a particular search meets the reasonableness standard 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" (citation and footnote omitted)); ***United States v. Place***, 462 U.S. 696, 703 (1983); ***State v. Murdock***, 155 Wis. 2d 217, 227, 455 N.W.2d 618 (1990), *overruled on other grounds by* ***State v. Dearborn***, 2010 WI 84, 327 Wis. 2d 252, 786 N.W.2d 97. Our job in reviewing a Fourth Amendment case such as this one is to determine whether law enforcement properly maintained that balance.

¶2 Following officers' warrantless entry into his hotel room and discovery therein of a handgun that had been reported stolen, Eric Bourgeois was charged with theft, threatening a law enforcement officer, and seven other criminal offenses. Because the entry was not supported by a warrant, Bourgeois filed a motion to suppress all evidence "recovered by the police from the hotel room and his residence, and any subsequent evidence derived therefrom." Following an evidentiary hearing, the circuit court denied the motion, concluding that exigent circumstances justified the officers' warrantless entry.[1] A trial was held, and Bourgeois was convicted of theft of the handgun and threatening a law enforcement officer. The jury acquitted him on all other charges.

---

[1] The Honorable Lee S. Dreyfus, Jr. presided over the hearing on the suppression motion.

2

¶3 On appeal, as before the circuit court, Bourgeois insists that the officers' entry into his hotel room violated his Fourth Amendment rights—due to the lack of a warrant or exigent circumstances justifying the entry—and the evidence procured from that unlawful entry must be suppressed. We agree that the entry was unlawful and evidence recovered from the search of Bourgeois's hotel room must be suppressed.

¶4 Bourgeois further asks that his "conviction*s*" be vacated due to that unlawful entry. (Emphasis added.) While we agree his conviction for theft of the handgun must be vacated, we do not agree with vacating his threatening-a-law-enforcement-officer conviction.

### *Background*

¶5 Joseph Vanderlinden, a Village of West Milwaukee police officer, testified at the suppression hearing that the police department ("PD") for the Village of Mukwonago had asked that West Milwaukee police officers look for Bourgeois at the Best Western Hotel in West Milwaukee across the street from a Veterans Administration Hospital ("VA") "[a]nd attempt to locate, stop, hold and advise if we found him." Vanderlinden had been informed that Bourgeois "may be in

3

possession of a stolen" handgun, "suffers from PTSD," and "has drug problems."[2] Vanderlinden learned that Bourgeois was an outpatient with the hospital but did not have a scheduled appointment there for two more weeks.

¶6    Around 1:46 a.m. on July 12, 2016, Vanderlinden had another West Milwaukee police officer, Steffen Pawlak, ask the hotel if Bourgeois had checked

---

[2] At trial, evidence was presented that on July 10, 2016, Bourgeois's downstairs duplex neighbor informed *Mukwonago* police officers not only that she suspected Bourgeois had taken her handgun and that he has post-traumatic stress disorder but also that he had made suicidal comments. (According to the complaint, the neighbor also informed these officers that she had found three bottles of her prescription medication, Hydrocodone, hidden in Bourgeois's apartment, which she had entered with Bourgeois's consent.) On appeal, the parties discuss the import of the suicidal-comments information conveyed to the Mukwonago police officers. The State notes that "[t]he transcript of the suppression motion hearing makes no mention whatsoever that officers were aware of prior reports of suicidal ideation or threats.… [T]here is no evidence in the record that at the time of the warrantless entry, the officers knew Bourgeois had a history of suicidal ideation or relied on that." We assume the State here is referring to *West Milwaukee* police officers having no knowledge of any possible suicidal ideations of Bourgeois at the time they entered his hotel room.

We note that the complaint indicates that after the Mukwonago police officers made contact with Bourgeois on July 10, they determined "there was nothing to indicate that [Bourgeois] was suicidal and he did not fit the criteria for a [WIS. STAT. ch.] 51 commitment." Trial testimony shows that when these officers interacted with Bourgeois that day, he told them he was "fine, didn't need any help, [and] was not going to hurt himself." Bourgeois also informed them that "he had made arrangements to go to ... the VA Center in Milwaukee, West Milwaukee," and the officers then "cleared the residence." Our own review of the record indicates that neither the suppression hearing transcript nor the trial transcript suggests that Mukwonago police officers conveyed to the West Milwaukee PD or the West Milwaukee police officers who entered Bourgeois's hotel room any information suggesting Bourgeois had suicidal ideations.

In addition to its concession that possible suicidal ideation by Bourgeois plays no role in our exigent circumstances analysis, the State also makes no attempt to invoke the collective knowledge doctrine, *see* **State v. Pickens**, 2010 WI App 5, ¶13, 323 Wis. 2d 226, 779 N.W.2d 1 (2009) ("[I]n a collective knowledge situation, if a defendant moves to suppress, the prosecutor must prove the collective knowledge that supports the stop."), which in certain circumstances would allow a court considering a suppression motion to combine the knowledge of multiple officers, *see* **State v. Alexander**, 2005 WI App 231, ¶13, 287 Wis. 2d 645, 706 N.W.2d 191 ("Under the collective knowledge doctrine, there are situations in which the information in the hands of an entire police department may be imputed to officers on the scene to help establish reasonable suspicion or probable cause." (citation omitted)). For these reasons, our analysis is limited to the West Milwaukee police officers knowing only that Bourgeois "may be in possession of a stolen 9 millimeter handgun," "suffers from PTSD," and "has drug problems" as they entered the Best Western hotel in search of Bourgeois on July 12.

in, and Pawlak learned that he had. Around 2:00 a.m., Vanderlinden, not wanting to alert Bourgeois to their police presence, secured a key card for Bourgeois's room from the front desk. Vanderlinden, Pawlak, and a third officer went to Bourgeois's room, which was quiet. Despite a "Do Not Disturb" sign on the door, the officers attempted to enter his room using the key card. They failed in this attempt because "the deadbolt was engaged." Despite being "a little worried about officer safety," the officers eventually began knocking, announcing "police," and getting "louder and louder." The officers received no response; Bourgeois's room remained quiet.

¶7 Vanderlinden returned to the front desk and procured a master key, returned to Bourgeois's room, and opened the door; however, he could only open it a few inches because the inside chain lock was engaged. Using a flashlight, Vanderlinden was able to "see a little bit in" the dark room and was able to see Bourgeois lying on the bed and "just staring towards the door." Bourgeois "didn't say anything," and Vanderlinden "didn't know if he was alive or not." Through the slightly-opened door, the officers again identified themselves as police and several times asked Bourgeois to come to the door. Bourgeois "basically" asked the officers, "[W]hat do you want?" and "Why are you here?" The officers "talked him into coming to the door" and asked him "numerous times if he could open the door and talk to us, that we were concerned about him." Bourgeois "either [asked] us what did we need or told us to leave. He was kind of back and forth." Vanderlinden could see Bourgeois's hands and observed he had nothing in them, including no firearm. Vanderlinden admitted that at that point, Bourgeois had not done anything alarming in their presence.

¶8 When Vanderlinden again said, "[J]ust open the door and talk to us," Bourgeois responded, "[T]hat's not going to happen," and he turned and walked away from the door. Vanderlinden "didn't know if [Bourgeois] was going to

5

retrieve the gun" and "was worried about him and us," so Vanderlinden broke open the door, and he, Pawlak, and the third officer secured Bourgeois in handcuffs and searched the room, locating a handgun on the bed. The then very-disturbed Bourgeois made repeated verbal threats toward the officers. Vanderlinden testified that approximately thirty to forty minutes passed from the time they arrived until they entered Bourgeois's room.

¶9     Officers subsequently took Bourgeois to the VA for treatment. During that time, Mukwonago PD informed Vanderlinden that it did not want Bourgeois in custody, but that it only wanted to recover the gun. Vanderlinden confirmed that he told the Mukwonago PD that the West Milwaukee PD "never would have attempted to even make contact with Mr. Bourgeois if" it had known that "all Mukwonago wanted was the firearm."

¶10    Pawlak clarified through his testimony at trial[3] that it was two days before their July 12 contact with Bourgeois—so, on July 10—that the Mukwonago PD had asked the West Milwaukee PD for help locating Bourgeois. Pawlak and members of his department first tried to locate Bourgeois at the Best Western Hotel on July 10, but he was not there at that time. The officers had "attempted several days of checking [for Bourgeois at] various businesses and the hotels around that area," including the Best Western, to no avail, but when they went to the Best Western around 1:46 a.m. on July 12, they learned that he had checked into that hotel.

---

[3] "When reviewing an order on a motion to suppress evidence, an appellate court may take into account the evidence at the trial, as well as the evidence at the suppression hearing." *State v. Griffin*, 126 Wis. 2d 183, 198, 376 N.W.2d 62 (Ct. App. 1985).

¶11 Other testimony at trial indicated that after the West Milwaukee police officers took Bourgeois to the VA Hospital for treatment, they took him to the Milwaukee County Mental Health Hospital because of verbal threats he continued to make toward the officers. After medical professionals there declined to admit him, the officers drove Bourgeois back to his duplex in Mukwonago and released him there, uncharged, hours after the entry into and search of his hotel room.

¶12 Upon returning home, Bourgeois went upstairs to his apartment. He later went to the lower apartment and began "pounding" on the door of his duplex-neighbor, who had reported the stolen handgun to Mukwonago police on July 10, demanding that she open her door. She told him to go away, but he continued, adding swears and threats, including that he was going to kill her, prompting her to call the Mukwonago PD. Bourgeois eventually returned to his upstairs apartment.

¶13 Mukwonago police officers responded to the duplex and were engaging with the neighbor when Bourgeois came downstairs again. Officers arrested him and placed him in handcuffs, which led to him stating, as Mukwonago Police Officer Jason Steinbrenner testified, "[S]omething to the effect that he was going to kill all of us and that Dallas was nothing." Steinbrenner presumed this to be a reference to "a shooting [a few days earlier] of several Dallas police officers … committed by a former military veteran who was singling out police officers and shooting them." Bourgeois's engagement with the police at that time—specifically with Steinbrenner—ultimately led to Bourgeois being charged with threatening a law enforcement officer, as well as the eight other criminal offenses, including theft of the handgun.

¶14 As indicated, Bourgeois was found guilty of theft of the handgun and threatening Officer Steinbrenner and found not guilty on the other charges, and he

was later sentenced. Bourgeois appeals, challenging the circuit court's denial of his suppression motion and his convictions that followed. Additional facts will be provided as necessary.

*Discussion*

The Theft Conviction

¶15 Bourgeois contends the West Milwaukee police officers' entry into his hotel room was unlawful because the officers entered without a warrant and exigent circumstances did not otherwise justify the entry. Because of this, Bourgeois asserts, evidence found in his hotel room, such as the stolen handgun, must be suppressed. We agree.

¶16 When, as in this case, the relevant facts are undisputed, we independently apply constitutional principles to those facts. *See State v. Delap*, 2018 WI 64, ¶¶26-27, 382 Wis. 2d 92, 913 N.W.2d 175.

¶17 "Warrantless entry into a residence is generally prohibited by the Fourth Amendment to the United States Constitution." *State v. Parisi*, 2014 WI App 129, ¶9, 359 Wis. 2d 255, 857 N.W.2d 472. This rule also applies to hotel rooms. *State v. Munroe*, 2001 WI App 104, ¶7, 244 Wis. 2d 1, 630 N.W.2d 223. Courts have recognized, however, that "in certain circumstances it would be unreasonable and contrary to public policy to bar law enforcement officers at the door," *State v. Richter*, 2000 WI 58, ¶28, 235 Wis. 2d 524, 612 N.W.2d 29 (citations omitted), such as when a warrantless entry is "both supported by probable cause and justified by exigent circumstances," *State v. Robinson*, 2010 WI 80, ¶24, 327 Wis.

8

2d 302, 786 N.W.2d 463.[4] "In such circumstances, we weigh the urgency of the officer's need to enter against the time needed to obtain a warrant." ***Richter***, 235 Wis. 2d 524, ¶28.

> There are four well-recognized categories of exigent circumstances that have been held to authorize a law enforcement officer's warrantless entry into a home: 1) hot pursuit of a suspect, 2) *a threat to the safety of a suspect or others*, 3) a risk that evidence will be destroyed, and 4) a likelihood that the suspect will flee….
>
> As in other Fourth Amendment cases, the determination of whether exigent circumstances are present turns on considerations of reasonableness, and we apply an objective test. The test is "[w]hether a police officer under the circumstances known to the officer at the time [of entry] reasonably believes that delay in procuring a warrant *would gravely endanger life* or risk destruction of evidence or greatly enhance the likelihood of the suspect's escape."

*Id.*, ¶¶29-30 (alterations in original; emphasis added).

¶18     The exigent circumstances test is not easily met. The State must show "by clear and convincing evidence that exigent circumstances justified [an] officer's lack of effort to secure a warrant." ***State v. Hay***, 2020 WI App 35, ¶22, 392 Wis. 2d 845, 946 N.W.2d 190. "When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some *real immediate and serious consequences* if he postponed action to get a warrant." ***State v. Smith***, 131 Wis. 2d 220, 235, 388 N.W.2d 601 (1986) (emphasis added; citation omitted), *abrogated on other grounds by **State v. Felix**, 2012 WI 36, 339 Wis. 2d 670, 811 N.W.2d 775. The burden rests "with those seeking exemption from the warrant

---

[4] The facts of this case also raise question as to whether the West Milwaukee police officers had probable cause to enter Bourgeois's hotel room. Bourgeois, however, does not argue on appeal that the officers lacked probable cause. In light of our holding today, the end result would be the same regardless of our determination of probable cause. For these reasons, we assume without deciding that there was probable cause, and we discuss it no further.

requirement to prove that the exigencies made that course *imperative*." ***State v. Guard***, 2012 WI App 8, ¶14, 338 Wis. 2d 385, 808 N.W.2d 718 (2011) (emphasis added; citation omitted).

¶19 In this case, the officers were not in hot pursuit of Bourgeois, the State does not suggest there was a risk he would destroy evidence, and, as the circuit court found following the suppression hearing, he was not a flight risk (assuming of course that officers remained outside his hotel room once they announced their police presence). Instead, we "weigh the urgency of the officer[s'] need to enter against the time needed to obtain a warrant" based upon the second exigency exception—whether "life" "would" have been "gravely endanger[ed]" if the officers had taken the time to procure a warrant instead of simply entering without one, as they did. *See* ***Richter***, 235 Wis. 2d 524, ¶¶28-30.

¶20 In defending the circuit court's denial of Bourgeois's suppression motion, the State relies upon ***Richter*** and ***State v. Kirby***, 2014 WI App 74, 355 Wis. 2d 423, 851 N.W.2d 796, but those cases provide it little support. Fourth Amendment considerations, including exigent circumstances, frequently turn on the specific facts of the particular case. Where relied-upon precedent involves facts very different from those in the case under review, such precedent often provides little guidance. The facts of both ***Richter*** and ***Kirby*** differ significantly from this case.

¶21 In ***Richter***, a responding sheriff's deputy was aware that an intruder had just broken into a trailer in the middle of the night, had fled that trailer upon being discovered, and had run into a second trailer across the street. ***Richter***, 235 Wis. 2d 524, ¶1. When the deputy arrived at the second trailer, he observed signs of forced entry and learned there were several people asleep inside. ***Id.*** Seeking the

intruder, the deputy entered the trailer without a warrant. While inside, the deputy found drug-related evidence that led to several charges against the owner of the trailer. *Id.*, ¶¶1-2. The owner moved to suppress the evidence based upon the warrantless entry, and the State claimed that the exigent circumstances of hot pursuit of the intruder and threat to the safety of those sleeping in the second trailer justified the entry. *Id.*, ¶31. The *Richter* court concluded that "[i]n a situation such as this, involving an unknown male intruder who forcibly entered not one but two occupied homes in the middle of the night, a reasonable officer would be completely warranted in the belief that a threat to safety existed." *Id.*, ¶42. The facts of *Richter* are nothing like those now before us and thus are not at all informative for our case.

¶22 In *Kirby*, the two officers who arrived at an apartment were outnumbered by five males who, reliable reports indicated, had recently displayed aggression and violence as the males had been involved in a nearby fight shortly before the officers arrived. *Kirby*, 355 Wis. 2d 423, ¶¶5-6, 10. Kirby, the "main aggressor" of the fight, who was identified at the apartment, had reportedly threatened "to come back to the area [of the fight] with a gun." *Id.*, ¶3. The doorway to the apartment was wide open when the officers arrived, and one of the officers stood in the doorway while speaking with several of the males in the apartment. *Id.*, ¶¶6, 8. This officer received a call from an investigator who indicated, again based upon reliable information, that if there was a black backpack in the apartment, "it had 'a sawed-off shotgun and a handgun' inside." *Id.*, ¶9. When she received the call, the officer moved a few steps into the apartment "to better see the 'family room area,'" and she observed a black backpack, leading her and the other officer to handcuff those present until the backpack could be searched. *Id.*, ¶¶9-11. A sawed-off shotgun was found in the backpack, and related charges were issued against Kirby, the owner of the backpack. *Id.*, ¶¶3, 12. Kirby moved to suppress the

11

shotgun based upon the warrantless entry into the apartment and search of the backpack. Because of the reliable information that an illegal weapon, the sawed-off shotgun, was present if a black backpack was on site, we determined that officer safety was at risk and that that exigent circumstance justified the immediate, warrantless entry and search. *Id.*, ¶¶1, 9-10, 13, 20.

¶23 The facts of *Kirby* also differ greatly from those in the case now before us. The apartment door in *Kirby* was wide open when the officers arrived, and one of the officers stood in the open threshold while engaging with the male suspects, who obviously were well aware from the get-go that officers were on the scene and investigating. In the instant case, the door to Bourgeois's room was bolted and chained shut, with a "Do Not Disturb" sign visible on the door—clearly indicating "do not enter or even look in." Before they started knocking and announcing their police presence, Bourgeois would have had no idea police were on the scene. The officers in *Kirby* were outnumbered by the individuals they were investigating, individuals who had just displayed aggression and their penchant for violence through fighting, with the main aggressor having threatened to return to the area of the fight with a gun. *Id.*, ¶¶6, 10. Here, the three officers had no reason to believe they were outnumbered as they had no reason to believe anybody except possibly Bourgeois was in the room. Furthermore, and significantly, Bourgeois had exhibited neither aggression nor a penchant for violence toward anyone nor threatened the law enforcement officers prior to them opening the door to his room. Like *Richter*, *Kirby* is not persuasive in convincing us exigent circumstances existed in this case.

¶24 When they arrived at the hotel on July 12, the West Milwaukee police officers had been looking for Bourgeois for two days after being informed he "may" be in possession of a stolen handgun, "suffers from PTSD," and "has drug

problems." Poised just outside his hotel room door around 2:00 a.m., they also were aware Bourgeois had checked into the hotel—and thus that he was likely in his room at that time of night—and that no sounds were coming from his room. Based on the record before us, when the officers knocked on the door to Bourgeois's silent hotel room and the room remained silent thereafter, the most likely conclusions of a reasonable officer would be that Bourgeois either was not in the room, was in the room but sleeping through the noise created by the officers, or was in the room and awake but desired to exercise his right to not interact with the officers. The officers heard no noises inside the room that would have suggested that harm to Bourgeois or the officers was a "real immediate and serious" risk—and likely to occur before a warrant could be secured.

¶25 As we have stated, "the *State* bears the 'heavy burden' to show by clear and convincing evidence that exigent circumstances justified [an] officer's lack of effort to secure a warrant." *Hay*, 392 Wis. 2d 845, ¶22. Here, the State directs us to no evidence suggesting that after learning Bourgeois had checked into the hotel—or even after attempting to open Bourgeois's door with the key card or after knocking on the door and announcing their police presence—the officers could not have presented a warrant application to a magistrate in a timely manner and done so without "gravely endanger[ing]" Bourgeois or the officers. Even if the officers had reason to believe it would take a substantial amount of time to present a warrant application to a magistrate—a fact which the State made no attempt to show at the suppression hearing—the State still failed to demonstrate that the opening of Bourgeois's door was justified as there was no clear and convincing showing of "real immediate and serious" risk of harm to Bourgeois or the officers if officers had waited outside Bourgeois's door while a warrant was sought. *See Smith*, 131 Wis. 2d at 235. The State failed to show that exigencies made the warrantless-entry

course of action taken by the officers "imperative," *see Guard*, 338 Wis. 2d 385, ¶14 (citation omitted), and thus that exigent circumstances justified Vanderlinden opening Bourgeois's door without a warrant.

¶26     The State discusses what Vanderlinden observed after opening the door as much as the chain lock would allow, despite identifying no legal basis for doing so.  Lacking a warrant or exigent circumstances, the officers had no lawful basis to open the door—even just the few inches they initially could—and peer inside or even speak to Bourgeois through that opening.  As the United States Supreme Court has stated:

> [A]ny physical invasion of the structure of the home, "by even a fraction of an inch," [is] too much, and there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor.  In the home, … *all* details are intimate details, because the entire area is held safe from prying government eyes.

*Kyllo v. United States*, 533 U.S. 27, 37 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1961)).  Thus, Vanderlinden did not lawfully observe Bourgeois lying on the bed staring at him, and the officers' utilization of the opening to more effectively coax Bourgeois to come to the door was also unlawful.  The peering in the room and the more effective coaxing, due to the direct visual and verbal contact, directly led to Vanderlinden's subsequent observation of Bourgeois walking toward the officers at the door and then turning away after refusing to let them in.  Absent Vanderlinden's unlawful opening of Bourgeois's door and utilization of that opening, there is no reason to believe Bourgeois ever would have even gotten out of bed much less been in a position to visibly turn away from the officers at the door.  Under the facts of this case, the officers' forced entry into the room—leading to the discovery of the gun—cannot be legitimized by Bourgeois's turning away

from the door because Vanderlinden's observation of this action was not lawfully grounded. *See State v. Buchanan*, 2011 WI 49, ¶23, 334 Wis. 2d 379, 799 N.W.2d 775 (An officer's observations of something in plain view are lawful—and admissible—only if the officer "has a right to be in the position to have the view."); *see also Kentucky v. King*, 563 U.S. 452, 462-63 (2011) ("[T]he Fourth Amendment requires … that the steps preceding the seizure be lawful."); *Robinson*, 327 Wis. 2d 302, ¶32 ("[P]olice officers may not benefit from exigent circumstances that they themselves create."); *Guard*, 338 Wis. 2d 385, ¶30 ("[T]he government cannot justify a search on the basis of exigent circumstances that are of the law enforcement officers' own making." (citation omitted)). Thus, for the foregoing reasons, we conclude the circuit court erred in denying the motion to suppress as it relates to items found by the officers in Bourgeois's hotel room.

¶27 But even if we were to consider Vanderlinden's observations following his unlawful slight-opening of Bourgeois's hotel room door, we would still conclude that no exigency justified the officers' forced entry into the room. Once the door was opened a few inches, Vanderlinden could see that Bourgeois was just lying on the bed "staring towards the door." He could also see that when Bourgeois rose from the bed and proceeded toward the door, he had nothing in his hands. Vanderlinden acknowledged that when Bourgeois told the officers to leave and he was not going to let them in, he had done nothing alarming in their presence. Ultimately, the record fails to show any reason why a reasonable officer would have believed Bourgeois had any intention of harming the officers as no testimony suggested that the manner in which he turned away from the door was threatening, that he had made any threatening statements toward any officers at or before that time, or that he had ever committed a violent act against anyone, much less law enforcement. Nor is there any evidence to suggest Bourgeois was injured in any

way, was in an otherwise medically-concerning condition, or was in a state of significant personal, self-harming distress.

¶28    Our supreme court has clearly stated that "[w]arrantless entry is permissible *only* where there is *urgent need* to [enter], *coupled with* insufficient time to secure a warrant." *Smith*, 131 Wis. 2d at 228 (emphasis added). Here, the State did not demonstrate by clear and convincing evidence that this standard was met. As a result, the evidence recovered by the West Milwaukee police officers from Bourgeois's hotel room—most notably the handgun—must be suppressed. *See Smith v. Carroll*, 2010 WI 8, ¶19, 322 Wis. 2d 299, 778 N.W.2d 1 ("[T]he exclusionary rule requires courts to suppress evidence obtained through the exploitation of an illegal search or seizure.").

The Threatening-A-Law-Enforcement-Officer Conviction

¶29    Bourgeois suggests that his threatening-a-law-enforcement-officer conviction also should be vacated if we conclude, as we do, that the West Milwaukee police officers' warrantless entry was unlawful. Neither party sufficiently develops an argument on this issue or on the more pointed question of whether evidence related to the threatening-a-law-enforcement-officer conviction must be suppressed. In a footnote, Bourgeois does quote *Carroll*, 322 Wis. 2d 299, ¶19, as stating that the exclusionary rule of suppressing evidence obtained through an illegal search or seizure "applies not only to primary evidence seized during an unlawful search, but also to derivative evidence acquired as a result of the illegal search, unless the State shows sufficient attenuation from the original illegality to dissipate that taint." After a thorough review of the record, we conclude that the evidence underpinning the threatening-a-law-enforcement-officer conviction—for

threatening Mukwonago Police Officer Steinbrenner—is not "derivative evidence acquired as a result of the illegal search" of Bourgeois's hotel room. ***Id.***

¶30    Black's Law Dictionary defines derivative evidence as "[e]vidence that is later *discovered by using* evidence that was illegally obtained." *Derivative evidence*, BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added).  In this case, law enforcement did not "use" the handgun or any other evidence seized from Bourgeois's hotel room to "discover" the evidence related to the threatening-a-law-enforcement-officer charge. Rather, Bourgeois created new criminal evidence when he committed this new crime against Officer Steinbrenner separate from the unlawful entry into Bourgeois's hotel room.[5]

¶31    We reverse and remand for a new trial on the theft-of-a-handgun charge, with evidence from the illegal entry and search of Bourgeois's hotel room suppressed.  The conviction for threatening a law enforcement officer stands.

*By the Court.*—Judgment affirmed in part; reversed in part; order reversed and cause remanded with directions.

---

[5] We further observe that from a harmless error perspective, none of the evidence recovered in the hotel room, such as the handgun, would have been necessary to secure a conviction on this threatening-a-law-enforcement-officer charge.