**COURT OF APPEALS
DECISION
DATED AND FILED**

**July 3, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2411**

**STATE OF WISCONSIN**

Cir. Ct. No. **2021TR3234**

**IN COURT OF APPEALS
DISTRICT II**

IN THE MATTER OF THE REFUSAL OF JOHN R. SCHUMACHER:

CITY OF MEQUON,

    PLAINTIFF-RESPONDENT,

  V.

JOHN R. SCHUMACHER,

    DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Ozaukee County: PAUL V. MALLOY, Judge. *Affirmed.*

¶1      GUNDRUM, P.J.[1]  John R. Schumacher appeals from a judgment of the circuit court determining he unlawfully refused chemical testing of his blood when requested by the arresting City of Mequon police officer.  He claims we should reverse because "the circuit court erred when it found that [the arresting officer] had probable cause to arrest [him] for operating a motor vehicle while under the influence of an intoxicant, and further, when it denied his motion to [dismiss the refusal proceedings] based upon the officer's failure to honor [Schumacher's] request that he submit to a test other than blood."  We conclude the court did not err, and we affirm.

### *Background*

¶2      After Schumacher's arrest for operating a motor vehicle while impaired (OWI), the arresting officer read to him the Informing the Accused form and asked him if he would submit to a blood draw for chemical testing.  He ultimately refused the officer's request, and the officer issued him a Notice of Intent to Revoke Operating Privilege.  Schumacher timely requested a refusal hearing.  Professing a lack of probable cause, Schumacher filed a suppression motion challenging the OWI arrest and the evidentiary fruits that flowed from it.[2] He also filed a motion to dismiss the refusal proceedings based on lack of probable cause and the fact that while he had refused to submit to a blood draw, he had offered to instead submit to a breath or urine test.  At the hearing on his motions, the following relevant evidence was presented.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(c) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] This appeal concerns only Schumacher's refusal to consent to a blood draw; his arrest for OWI is not before us.

¶3      The officer testified that around 9:00 p.m. on November 15, 2021, he observed a vehicle with a nonfunctioning driver's side headlight. As the vehicle passed him, the officer "noticed that … there was pretty significant driver's side damage done to [the] vehicle," and he believed the damage had occurred recently because he "could actually hear pieces of the vehicle scraping on the pavement." Conducting a traffic stop based on the defective headlight, the officer identified Schumacher as the driver and sole occupant of the vehicle.

¶4      When the officer asked Schumacher how the damage had occurred, he indicated he had "struck … a sign [pole] somewhere" but "didn't know exactly where." Schumacher "peek[ed] out of the vehicle and [was] surprised by the extent of the damage. He was unaware of how extensive the damage to the vehicle was." While speaking with Schumacher, the officer smelled the odor of intoxicants and observed that Schumacher had "glassy, bloodshot eyes." Schumacher admitted to having consumed alcohol and coming from Maxwell's, an establishment the officer knew to be "like, a bar."

¶5      The officer had Schumacher perform field sobriety tests, beginning with the horizontal gaze nystagmus (HGN) test. The officer testified there are "six clues" associated with this test that indicate impairment, and the officer observed four with Schumacher—"a lack of smooth pursuit" and "nystagmus at max[imum] deviation" in both of Schumacher's eyes. The officer did not observe "the onset of nystagmus prior to 45 [degrees]" in either eye, two other possible clues. The officer then checked Schumacher for vertical nystagmus, which would indicate "a high alcohol level," but the officer did not observe this in either of his eyes.

¶6      Schumacher then performed the walk-and-turn test. On this test officers look for eight potential clues of impairment, although two clues are

indicative of impairment. While the officer was instructing Schumacher with regard to this test, he displayed his first clue in that he "was not able to keep balance and did break from [his] starting position." Schumacher then returned to the starting position, but shortly thereafter "[b]r[oke] for a second time from that starting position." Schumacher showed three additional clues of impairment on this test—missing heel-to-toe with his steps on four occasions, turning in an incorrect manner, and using his arms to maintain balance while taking the steps.

¶7     Schumacher then performed the one-legged-stand test, on which an officer looks for four possible clues of impairment, with two out of four indicating impairment. Schumacher exhibited one of the four possible clues.

¶8     The officer then administered a preliminary breath test (PBT) to Schumacher, which showed a result of .037. The officer testified that "[b]ased on [his] previous experience with OWIs," he concluded that "the number of clues [Schumacher had exhibited on his field sobriety tests] was not consistent with the result of the PBT." As a result, the officer suspected "additional medications or something [in addition to alcohol] … was … causing additional impairment."

¶9     Believing Schumacher to be impaired, the officer arrested him and subsequently read him the Informing the Accused form. Because the officer "believed there to be drugs that may have" been contributing to Schumacher's impairment, the officer asked Schumacher if he would submit to a blood test. Schumacher responded "that he would do breath or urine and that he wanted to do breath because he knew he hadn't drank a lot." Several times the officer reiterated that he was requesting a blood test, and Schumacher eventually agreed. The officer concurred that Schumacher made a comment "about not wanting someone with Parkinson's drawing his blood," which the officer interpreted as meaning

4

"[t]hat he was going to be voluntary for the blood draw, but he just wanted to make sure that it was done by a qualified individual."

¶10 After the officer transported Schumacher to the hospital for a blood draw, Schumacher indicated "he no longer wanted to go forward with the blood test." The officer treated this as a refusal of the blood draw, so he applied for and received a search warrant for the draw.

¶11 On cross-examination, the officer agreed he was not a drug recognition expert; he pulled Schumacher over because of the non-functional headlight and had not observed Schumacher's vehicle speeding, swerving, or deviating lanes; and Schumacher responded timely and appropriately to the officer's emergency lights, including parking properly on the side of the road. The officer acknowledged that he did not note any concerns regarding Schumacher's ability to speak or any balance problems other than those displayed during the field sobriety tests; Schumacher consistently stated he only had "a beer to a beer-and-a-half" while at Maxwell's; and Schumacher told the officer that he struck the sign pole because "he was in the midst of a breakup with his girlfriend and had been looking at his phone at some texts he was receiving from her." The officer further testified that during the HGN test, Schumacher kept his head still, consistent with instructions, and agreed that he did not sway.

¶12 Related to the walk-and-turn test, the officer acknowledged that Schumacher did touch heel-to-toe as instructed on fourteen of the eighteen total steps he took and that he did not recall Schumacher ever stepping "off the line" on any of the eighteen steps. The officer acknowledged no evidence of drugs or drug paraphernalia was found on Schumacher's person or in his vehicle.

¶13 The officer agreed that when he read the Informing the Accused form to Schumacher and asked him to submit to a blood test at the location of the traffic stop, Schumacher indicated "something to the effect of I don't like needles, but I'll do urine or breath," and the officer responded by telling Schumacher he wanted a blood test. The officer acknowledged that in most first offense cases in the city, the primary test used is a breath test, the city has a breath testing machine at the police department, and there was nothing preventing him from administering that test to Schumacher the night of the arrest. The officer added that the decision to have Schumacher do a blood test instead of a breath test "was a decision I made." The officer admitted that Schumacher several times reiterated his willingness to do a breath or urine test instead of a blood test.

¶14 In response to questioning by the circuit court, the officer testified that the damage to Schumacher's vehicle included dislodgement of the "wheel well cowling," destruction of the driver's side headlight, and "also some significant damage on the hood with it fairly crumpled." The officer agreed that it "[wa]sn't like … a bump in a parking lot."

¶15 The circuit court denied Schumacher's motion to dismiss the refusal proceedings, concluding the officer did have probable cause to arrest Schumacher for OWI and the officer's insistence on a blood test instead of allowing Schumacher to instead do an alternate test did not violate the constitution. Schumacher appeals.

*Discussion*

*Probable Cause*

¶16    Schumacher first asserts the circuit court erred in denying his motion because it erroneously concluded the officer had probable cause to arrest him for OWI.  The court did not err.

¶17    Issues that a defendant may raise at a refusal hearing are limited to (1) "whether the [defendant] was lawfully placed under arrest for [an OWI-related offense]," (2) whether the officer properly informed the defendant of his or her rights and responsibilities under the implied consent law, and (3) whether the defendant "refused to permit the test."  *See* WIS. STAT. § 343.305(9)(a)5.a.-c.  In this case, Schumacher challenges the circuit court's conclusions that the officer had probable cause to arrest him—and therefore that the arrest was lawful—and that he "refused to permit the test" when he had agreed to instead provide a urine sample.

¶18    "In the context of a refusal hearing following an arrest for operating a motor vehicle while intoxicated, 'probable cause' refers generally to that quantum of evidence that would lead a reasonable law enforcement officer to believe that the defendant was operating a motor vehicle while under the influence of an intoxicant." ***Washburn County v. Smith***, 2008 WI 23, ¶15, 308 Wis. 2d 65, 746 N.W.2d 243.  The City's burden of persuasion is "substantially less [at a refusal hearing] than at a suppression hearing," *see* ***State v. Pfaff***, 2004 WI App 31, ¶16, 269 Wis. 2d 786, 676 N.W.2d 562; it "only [must] show that the officer's account is plausible," *see* ***State v. Wille***, 185 Wis. 2d 673, 681, 518 N.W.2d 325 (Ct. App. 1994).  "Indeed, the court need not even believe the officer's account.  It need only be persuaded that the [City's] account is plausible." *See* ***id.***

¶19    Whether an officer had probable cause to arrest is a question of law we review de novo.  *Smith*, 308 Wis. 2d 65, ¶16.  Probable cause "must be assessed on a case-by-case basis," *State v. Lange*, 2009 WI 49, ¶20, 317 Wis. 2d 383, 766 N.W.2d 551, and "exists where the totality of the circumstances within the arresting officer's knowledge at the time of the arrest would lead a reasonable police officer to believe, in this case, that the defendant was operating a motor vehicle while under the influence of an intoxicant," *State v. Nordness*, 128 Wis. 2d 15, 35, 381 N.W.2d 300 (1986).  Probable cause is a question "based on probabilities; and, as a result, the facts faced by the officer 'need only be sufficient to lead a reasonable officer to believe that guilt is more than a possibility.'" *County of Dane v. Sharpee*, 154 Wis. 2d 515, 518, 453 N.W.2d 508 (Ct. App. 1990) (citation omitted).

¶20    WISCONSIN STAT. § 346.63 provides that:

(1)  No person may drive or operate a motor vehicle while:

(a) Under the influence of an intoxicant, a controlled substance, a controlled substance analog or any combination of an intoxicant, a controlled substance and a controlled substance analog, under the influence of any other drug to a degree which renders him or her incapable of safely driving, or under the combined influence of an intoxicant and any other drug to a degree which renders him or her incapable of safely driving.

Here, the officer arrested Schumacher based on his belief that Schumacher was impaired by "medications or something" in addition to alcohol, which would be in violation of § 346.63(1)(a).  Based on the facts of which the officer was aware at the time of arrest, a reasonable officer would have had probable cause to believe Schumacher was in violation of this statute, justifying the arrest.

¶21 At the time he arrested Schumacher, the officer was aware Schumacher had been in an accident where he had run into a (presumably) stationary sign pole. His vehicle sustained significant damage to the front driver's side, yet when he "peek[ed] out of the vehicle" during the traffic stop, Schumacher was "surprised" and "unaware of how extensive the damage to the vehicle was." Furthermore, Schumacher had no awareness of where this recent and significant accident took place. These facts suggest impairment was more than a possibility because unimpaired drivers do not generally run into stationary sign poles; furthermore, a reasonable vehicle operator who sustained such significant damage just feet in front of him on his vehicle would tend to have a better awareness of the extent of the damage and the location at which it had recently occurred.

¶22 While speaking with Schumacher, the officer noticed the odor of intoxicants and observed he had "glassy, bloodshot eyes," all common indicia of impairment. Administering field sobriety tests to Schumacher, the officer observed four out of six possible clues of impairment on the HGN test, four out of eight clues on the walk-and-turn test, and one out of four clues on the one-legged-stand test. The PBT administered to Schumacher read .037, which, based on the officer's experience and the number of clues of intoxication observed with the field sobriety tests, led the officer to believe "medications or something," such as other drugs, in addition to alcohol "was … causing additional impairment," which is why the officer insisted on a blood test following the arrest. Essentially, because Schumacher appeared to be more impaired than a person with a .037 blood alcohol reading would normally be, the officer rationally concluded that other substances were likely contributing to his impairment.

¶23 While, understandably, Schumacher emphasizes his "normal" actions on the night of his arrest that would tend to lead a person to believe he was

not impaired—e.g., the officer directly observed no unsafe driving, Schumacher did not slur his speech, and others—those do not somehow wipe away the indicia of impairment of which the officer was aware. As indicated, it is not normal for an unimpaired driver—even one looking at texts from a girlfriend, if that be the truth—to run into a stationary sign pole which, based upon the location of the damage on the vehicle, would have been right in front of Schumacher when he drove toward it and struck it. Furthermore, it would be unusual indeed for an unimpaired driver to smell of alcohol, have glassy, bloodshot eyes, sustain significant damage to the front driver's side of his vehicle without knowledge or awareness of the extent of the damage and the location where it had occurred, and perform poorly on his field sobriety tests. Here, "a reasonable law enforcement officer [would] believe that [Schumacher] was operating a motor vehicle while under the influence of an intoxicant." *See Smith*, 308 Wis. 2d 65, ¶15. A reasonable officer would believe it was "more than a possibility" that Schumacher had violated WIS. STAT. § 346.63(1)(a) by operating his vehicle while "[u]nder the influence of … any combination of an intoxicant, a controlled substance and a controlled substance analog" or "under the combined influence of an intoxicant and any other drug to a degree which renders him or her incapable of safely driving," justifying his arrest. *See Sharpee*, 154 Wis. 2d at 518. The circuit court correctly concluded the officer had probable cause to arrest Schumacher.

*Refusal to Submit to a Blood Test*

¶24 Although somewhat reluctantly, Schumacher initially agreed to submit to a blood test, as requested by the officer. Then, after arriving at the hospital, and as time was ticking—thus compromising the evidentiary value of any sample, *see Skinner v. Railway Lab. Execs.' Ass'n*, 489 U.S. 602, 623 (1989) ("[A]lcohol and other drugs are eliminated from the bloodstream at a constant

rate."); ***State v. Dieter***, 2020 WI App 49, ¶12, 393 Wis. 2d 796, 948 N.W.2d 431 ("Alcohol dissipates as it is absorbed in the bloodstream and metabolized; therefore, the passage of time between alleged intoxicated driving and the collection of a blood sample affects the quantity of alcohol that testing will reveal."); ***State v. Parisi***, 2016 WI 10, ¶41, 367 Wis. 2d 1, 875 N.W.2d 619 (recognizing "the rapid dissipation of heroin in the blood")—he changed his mind and refused to provide a blood sample, but again indicated a willingness to take a breath or urine test.[3]

¶25 As indicated, the arresting officer had probable cause to believe Schumacher was impaired by a combination of alcohol and drugs of some kind— the officer indicated that the PBT test suggested a lower level of alcohol in Schumacher's system than would explain his compromised condition. As Schumacher admits, the officer's concern that impairing drugs might be in Schumacher's system is why the officer sought a blood test instead of the breath test available at the police department.[4] As we have stated,

> [w]hile it is true alcohol was the only impairing substance the officer who arrested Coffee detected at the time of arrest, the *offense* for which he was arrested, i.e., the "offense of arrest," was "[o]perating under [the] influence of intoxicant or other drug," WIS. STAT. § 346.63 (2017-18). A driver can, of course, violate this statute by being

---

[3] At various points in his briefing, Schumacher appears to suggest he is challenging the reasonableness of the blood test in light of his apparent willingness to instead take a urine *or breath* test. His developed arguments, however, only address whether the officer's insistence on a blood test was reasonable in light of his apparent willingness to provide a *urine* test. Because Schumacher develops arguments only with regard to the reasonableness of the ordered blood test in light of his apparent willingness to submit to a urine test, that is the issue we address.

[4] Schumacher acknowledges that "[t]he ostensible concern in this matter was that he was under the influence of a controlled substance and *that is why* a sample of his blood was being sought." (Emphasis added.)

11

impaired solely by alcohol. However, the offense can also be committed by a driver being impaired by a single legal or illegal drug, a combination of drugs, or a combination of one or more drugs with alcohol. *See* § 346.63(1)(a). Precisely what substance or combination of substances are the cause of the impaired condition an officer observes on the scene is not always readily known. While an officer may smell a strong, weak, or moderate odor of alcohol, obviously indicating that alcohol is likely at least one substance contributing to the driver's impaired condition, this initial observation does not always tell the full story. It is not unusual for a driver's impaired condition to be caused by a potpourri of substances—some legal, some illegal, some easily detected, some not—sometimes including alcohol, sometimes not. All such substances are relevant to proving that the driver is in violation of § 346.63(1)(a) due to driving while impaired by either drugs, alcohol, or both.

*State v. Coffee*, 2019 WI App 25, ¶11, 387 Wis. 2d 673, 929 N.W. 245 (footnotes omitted), *aff'd*, 2020 WI 53, 391 Wis. 2d 831, 943 N.W.2d 845. As our supreme court has stated:

Securing a breath test rather than a blood test may not be satisfactory to law enforcement because an officer may want to determine whether the person is also under the influence of controlled substances. *Blood samples are the most direct means of measuring alcohol concentration in the blood and of obtaining evidence of controlled substances in the blood.* A breath test is not likely to reveal the presence of a controlled substance.

*State v. Krajewski*, 2002 WI 97, ¶40, 255 Wis. 2d 98, 648 N.W.2d 385 (emphasis added).

¶26 Nonetheless, Schumacher asserts that it was unreasonable under the Fourth Amendment for the officer to "request that [he] provide a sample of his blood for evidentiary analysis when he was willing to provide the officer with a urine specimen." He tries mightily to convince us that the urine test he told the

officer he was willing to take[5] would have been an even better evidentiary option than the blood test, professing "that the dissipation of controlled substances, whether of the restricted variety or not, is ***not*** rapid from urine" and "when it comes to testing a person for the ingestion of a variety of controlled substances, urine testing is actually *better* than blood testing in terms of sublimating any exigency attendant to 'rapid dissipation.'" Schumacher's efforts, however, go nowhere as neither party presented any evidence at the hearing regarding urine testing, including whether a urine test was even a feasible option for the officer to pursue the night of Schumacher's arrest. And, Schumacher has directed us to nothing suggesting it was the City's burden to prove urine testing was not a feasible option.

---

[5] The City asserts that "[n]either ***Birchfield*** [***v. North Dakota***, 579 U.S. 438, 447 n.1 (2016)], nor any case subsequent to it, imposed upon OWI investigations a 'least intrusive method' requirement as to a search conducted pursuant to a warrant," citing ***City of Ontario v. Quon***, 560 U.S. 746, 763 (2010) ("[The United States Supreme Court] has 'repeatedly refused to declare that only the least intrusive search practicable can be reasonable under the Fourth Amendment." (citation omitted)). Rather, the City asserts that "***Birchfield***, and cases subsequent to it, have only held that a blood draw cannot be administered as a *warrantless* search incident to arrest absent exigent circumstances." (Emphasis added.)

Schumacher disagrees, asserting that as to the "less intrusive" method requirement, it makes no constitutional difference whether the search is conducted pursuant to a warrant, as in this case, "incident to arrest, via an implied consent statute, [or] via exigent circumstances." He, however, provides no legal support for this position.

We agree with the City that "[t]here is no constitutional requirement that police … seek a warrant for[] the least intrusive means of obtaining evidence. Because no such requirement exists, there is no basis for Schumacher's claim that the officer was 'constitutionally unreasonable' to seek a warrant for a blood draw." And, as the City further points out, ***Birchfield*** "reaffirmed that 'where substances other than alcohol impair the driver's ability to operate a car safely … nothing prevents the police from seeking a warrant [for a blood draw].'" At the end of the day, a judge issued a search warrant for the blood draw in this case, and Schumacher does not challenge the validity of that warrant.

¶27    Even if the parties had presented evidence demonstrating the feasibility of urine testing, we reject Schumacher's conclusory assertion that the collection of a urine sample is less intrusive than a blood draw. In *Birchfield v. North Dakota*, 579 U.S. 438, 474 (2016), the United States Supreme Court compared blood and breath tests, concluding that blood tests "are significantly more intrusive [than breath tests], and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test." Schumacher invites us to simply substitute "urine tests" in place of "breath tests"; we reject this invitation because a urine test is itself more intrusive than a breath test.

¶28    The City asserts that the collection of a urine sample implicates privacy concerns that the collection of a breath sample does not, specifically noting that a breath test may be performed in front of members of the public, but a urine test may not. In support of its assertion, the City cites to the United States Supreme Court's statement that "[t]here are few activities in our society more personal or private than the passing of urine…. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as by social custom." *Skinner*, 489 U.S. at 617 (citation omitted). The *Skinner* Court further stated that urine tests are the performance of "an excretory function traditionally shielded by great privacy," and as such "raise concerns not implicated by *blood or breath* tests." *Id.* at 626 (emphasis added). Indeed, the City directs us to a post-*Birchfield* decision in which the Minnesota Supreme Court held that "in terms of the impact on an individual's privacy, a urine test is more like a blood test than a breath test." *State v. Thompson*, 886 N.W.2d 224, 232 (Minn. 2016). While Schumacher asserts that urine testing is just as "less invasive" than blood testing as breath testing is, he makes no attempt, in either his brief-in-chief or reply brief, to develop an

14

argument in support of his just-substitute-in-urine-test-for-breath-test position by either directing us to relevant case law or comparing privacy and intrusiveness concerns of a urine test with those of a breath test.

¶29 We agree with the City that a urine test has privacy concerns beyond those associated with a breath test—for example, urine is part of the subject's body (albeit a waste product) that is being retained by law enforcement and an officer must observe the passing of the urine from the subject's body, requiring observation of the subject's genitalia. *See* WISCONSIN DEP'T OF JUSTICE, PHYSICAL EVIDENCE HANDBOOK 231 (9th ed. 2017).[6] We decline Schumacher's self-serving and unsupported invitation to treat a urine test as constitutionally identical to a breath test for purposes of challenging the reasonableness of the officer's insistence on a blood test.

¶30 As the United States Supreme Court recognized in ***Birchfield***, "[o]ne advantage of blood tests [as opposed to breath tests] is their ability to detect not just alcohol but also other substances that can impair a driver's ability to operate a car safely." ***Birchfield***, 579 U.S. at 474. "A breath test cannot do this, but police have other measures at their disposal when they have reason to believe that a motorist may be under the influence of some other substance (*for example, if a breath test indicates that a clearly impaired motorist has little if any alcohol in his blood*)." ***Id.*** (emphasis added). The Court continued, "[n]othing prevents the police from seeking a warrant for a blood test when there is sufficient time to do so in the particular circumstances or from relying on the exigent circumstances

---

[6] A copy of this handbook is available at https://www.doj.state.wi.us/sites/default/files/dles/clab-forms/2021_physical-evidence-handbook-2017.pdf.

exception to the warrant requirement when there is not." *Id.* at 474-75 (emphasis added). Notably, while the Court recognized urine tests as a third type of test option occasionally utilized by law enforcement with drunk drivers,[7] it stated that "[n]othing prevents" police from seeking a warrant for a blood test when there is probable cause to believe a person is under the influence of drugs or a combination of drugs and alcohol. Even though the cases before it did not involve urine tests, the Court could have hedged its "[n]othing prevents" language with some indication that the potential availability of a urine test could affect the equation related to the constitutionality of blood tests; yet, it did not. Instead, it only noted in a footnote that "urine tests appear to be less common in drunk-driving cases than breath and blood tests." *Id.* at 447 n.1.[8]

¶31 The officer's insistence on a blood test is also supported by the statutes, none of which Schumacher challenges. WISCONSIN STAT. § 343.305(2) provides that "[t]he law enforcement agency by which the officer is employed … may designate which of the tests shall be administered first." Paragraph (3)(a) of that same statute also provides that

> [u]pon arrest of a person for violation of [an OWI-related offense] … a law enforcement officer may request the person to provide one or more samples of his or her breath, blood or urine…. Compliance with the request for one type of sample does not bar a subsequent request for a different type of sample.

---

[7] Early in its decision, the ***Birchfield*** Court noted that "[i]n addition [to blood and breath tests], BAC may be determined by testing a subject's urine, which [like a breath test] also requires the test subject's cooperation." 579 U.S. at 447 n.1.

[8] As the City points out, in ***State v. Forrett***, 2022 WI 37, ¶8 n.4, 401 Wis. 2d 678, 974 N.W.2d 422, our supreme court recently noted that "[n]either the [United States] Supreme Court nor this court has addressed the Fourth Amendment implications of a urine test."

Sec. 343.305(3)(a). Based on this language, the law enforcement agency is authorized by statute to determine what type of test to administer to an OWI suspect. Additionally, § 343.305(4), the statutorily required language for the implied consent warnings, provides in part:

> This law enforcement agency now wants to test one or more samples of your breath, blood or urine to determine the concentration of alcohol or drugs in your system. If any test shows more alcohol in your system than the law permits while driving, your operating privilege will be suspended. *If you refuse to take any test that this agency requests*, your operating privilege will be revoked and you will be subject to other penalties….
>
> *If you take all the requested tests*, you may choose to take further tests. You may take the alternative test that this law enforcement agency provides free of charge. You also may have a test conducted by a qualified person of your choice at your expense. You, however, will have to make your own arrangements for that test.

(Emphases added.) The above language also indicates that the law enforcement agency, not the OWI suspect, decides which test will be administered to the suspect. The officer here read the Informing the Accused form to Schumacher and decided to request a blood test. Only "[*i*]*f* [Schumacher took] all the requested tests" could he have chosen to take an "alternative test," which test "is not a test of the person's choice in lieu of the test requested by the officer. It is an additional test." *See Krajewski*, 255 Wis. 2d 98, ¶¶21, 36 n.15 ("Wisconsin's implied consent law does not grant drivers a statutory right to choose which test will be administered. In Wisconsin, a driver impliedly consents to take the test requested by a law enforcement officer.").

¶32 The *Krajewski* court made clear "that a person's agreement to submit to a test of the person's choice does not … *render unconstitutional a nonconsensual test of the officer's choice*." *Id.*, ¶63 (emphasis added). Thus, the

17

officer's decision in that case to proceed with requesting a blood draw even though the defendant stated he feared needles and indicated he would be willing to give either a breath or urine sample was "reasonable and constitutional." ***Id.***, ¶¶63-64. The ***Krajewski*** court pre-emptively put the nail in the coffin of Schumacher's appeal by further unambiguously stating that it "will not vest drivers who have been arrested for operating under the influence with the authority to veto constitutional searches to vindicate their personal choice in police procedure." ***Id.***, ¶43. Even aside from the other shortcomings of Schumacher's appeal, we are bound by ***Krajewski***. Moreover, we do not see ***Birchfield*** as in any way undermining ***Krajewski***.

¶33 It is Schumacher's burden on appeal to show how the circuit court erred. *See **Gaethke v. Pozder***, 2017 WI App 38, ¶36, 376 Wis. 2d 448, 899 N.W.2d 381 ("[O]n appeal 'it is the burden of the appellant to demonstrate that the [circuit] court erred.'" (second alteration in original; citation omitted)). He has not satisfied this burden.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.